## THE GENEVIEVE.

### THE VULCAN.

#### (District Court, N. D. New York. October 13, 1899.)

1. COLLISION—SUIT FOR DAMAGES—DETERMINING FAULT.

   In determining, on conflicting testimony, which of two vessels was in fault for a collision, the court will take into consideration the probabilities and presumptions based upon the skill, knowledge, and ability of the crews of the respective vessels, which was the better manned, and the less likely to make a mistake.

2. SAME—STEAM VESSELS MEETING—SIGNALS.

   Where the one of two meeting steam vessels having the right of way fails to signal as required by the rules governing navigation on the lakes (28 Stat. 645), on approaching the other may properly signal by two blasts, in accordance with rule 23, meaning, "I am directing my course to port," and she is not required to wait for an answering signal before changing her course.[1]

---

[1] As to signals of meeting vessels, see note to The New York, 30 C. C. A. 630.

**3. SAME—EVIDENCE OF FAULT.**
Where a steam vessel passing down the Detroit river in the night, and having the right of way, failed to signal, as required by the rules, when half a mile from a vessel passing up, and, on receiving a signal from the latter vessel when nearer, answered by. a cross signal, changed her course accordingly, and continued at full speed, in violation of rule 26, although the vessels were then near together; she must be held in fault for a resulting collision.

In Admiralty.   Cross libels by the steam tug Genevieve and the propeller Vulcan to recover damages for collision.   On final hearing.

George Clinton, for the Genevieve.

John C. Shaw, for the Vulcan.

COXE, District Judge.   The collision occurred at 3 o'clock a. m., October 17, 1897, between the steam propeller Vulcan and the tow of the steam tug Genevieve, opposite Mamajuda Island in the Detroit river.   The Vulcan is 260 feet long and 38 feet beam.   She was bound up the river with a load of coal and was drawing 16 feet of water.   She was properly manned and equipped; she was fitted with all the modern appliances and had the full complement of officers and men.   At the time of the collision her master and mate were on the pilot house, the steersman was at the wheel and there was a lookout at the bow.   She was proceeding at the rate of about $9\frac{1}{2}$ miles an hour.   The Genevieve is 55 feet long, $15\frac{1}{2}$ feet beam and was, at the time in controversy, drawing 9 feet aft and 5 feet forward.   She was towing a flat-bottomed scow 127 feet long and about 30 feet beam.   The scow was square-ended with a long overhang at each end.   She carried a large derrick forward with a boiler and engine house 16 feet wide, 40 feet long and 10 feet high.   In front of the derrick was a frame 35 feet high and 40 feet wide at the base.   The scow was drawing about 4 feet of water.   She was fastened to the tug by an 80-foot hawser and a bridle.   There was a cross timber 47 feet from her bow projecting out beyond the sides of the scow.   The night was dark but clear.   Lights could be seen a long distance off.   There was no wind.   Both the Vulcan and the Genevieve displayed the proper lights.   There was a lookout on the tug stationed just forward of the pilot house and there was a wheelsman at the wheel.   These two men composed the entire deck crew of both tug and tow.   No one was on the scow.   The tug was proceeding down the river at the rate of about $7\frac{1}{2}$ miles an hour.   The stem of the Vulcan struck the tow a little forward of midships on the port side at the angle made by the projecting timber.   The blow caused damage to both vessels but principally to the scow which was so badly injured that she sank soon afterwards.

The cause for such collisions as this must generally be sought for at a time prior to the few moments immediately preceding the impact.   After the vessels are in close proximity either or both, in the stress of sudden danger, may adopt an unwise and imprudent course.   The question is, who is to blame for bringing the vessels into a position where cool calculation is impossible?

In arriving at a correct answer to this question the court should take into consideration the probabilities and presumptions based

upon the skill, knowledge and ability of the crews of the respective vessels. Which of the two would be most likely to make a mistake? The Vulcan was engaged in a business which required her to pass up and down the Detroit river many times a year in daylight and at night. Her master and mate were experienced mariners and in the prime of life. They were perfectly familiar with the channel, the lights and the ranges. At the time of the collision both of them were on the pilot house high above the water and thus able to get a commanding view of approaching vessels and to judge distances with accuracy. In addition to the master and mate was the lookout and steersman. The Genevieve, on the contrary, had but one man on deck and one man in the pilot house. Both were licensed pilots and sailors of long experience, but both were old men, probably over 60 years of age, and neither, of late years, had much experience in the navigation of the Detroit river. They were unfamiliar with some of the ranges and some parts of the channel and, being but a few feet above the water on the night in question, had not the same opportunity for extended vision as the crew of the Vulcan. It certainly is a fair statement to assert that the Vulcan was much better manned and less likely to make a mistake in navigation than the Genevieve.

When the first signal was given the vessels were separated by half a mile in distance and two minutes in time. The witnesses on the Vulcan agree substantially that the distance was less than half a mile. The two witnesses on the Genevieve are not in accord; one places it at between a quarter and a half a mile; the other at between three-quarters of a mile and a mile. It would be against the weight of evidence to place the distance at more than a half a mile.

The sailing rule applicable to the situation is rule 24 of the act of February 8, 1895. It is as follows:

"That in all narrow channels where there is a current, and in the rivers Saint Mary, Saint Clair, Detroit, Niagara, and Saint Lawrence, when two steamers are meeting, the descending steamer shall have the right of way, and shall, before the vessels shall have arrived within the distance of one-half mile of each other, give the signal necessary to indicate which side she elects to take."

Here, then, was a plain duty imposed upon the Genevieve. The vessels had reached the half-mile distance. Before that point was reached the Genevieve was commanded to signal the Vulcan the side she desired to take. The command was disobeyed and the duty wholly neglected. This, in the judgment of the court, was the initial fault to which all the others can be easily traced. This fault was committed deliberately and intentionally. Capt. Pratt, who was in charge of the Genevieve, says he did not blow a signal and did not intend to blow any. He thought the vessels would pass without any communication between them and he expected to take the chances and remain quiet. When the first signal was given he thinks the Vulcan was not much more than a quarter of a mile distant.

It is, of course, idle for the tug to contend after this testimony, that the half-mile point was not reached and that she might have signaled had not the Vulcan anticipated her. The evidence shows that the Vulcan waited till the last moment before indicating the course.

She did not act in this regard until it was perfectly evident that the Genevieve intended to pass without signal of any kind. The Vulcan saw the Genevieve when the vessels were a long distance apart, the former being still on the Limekiln ranges. When the Vulcan had turned upon the Grosse Isle range and was coming up on a course a little to the westward of that range her attention was particularly directed to the Genevieve. According to the testimony on behalf of the Vulcan the tug was coming down on a course to the eastward of the course from Grassy Island to Mamajuda Island, showing both lights. After waiting for a signal until it was evident that none would be given the Vulcan blew two blasts and put her wheel to starboard as required by rule 23.

The Vulcan is criticised for starboarding before she received a reply to her signal. The answer is twofold: First, the time was so short that prompt action was imperative, there was no time for experiments; and, second, the Vulcan did precisely what the rule requires—"two blasts to mean, 'I am directing my course to port.'" The rule does not say that two blasts shall mean, "I intend to direct my course to port," or "I will direct my course to port if you agree to it." What it does say is this, "I am now, at the moment you hear this signal, swinging to port."

No fault can be imputed to the Vulcan in giving the signal. Upon her own testimony such a signal was not only proper; it was absolutely necessary. Not to have given it would have been gross negligence.

But even upon the testimony of the two witnesses for the Genevieve the Vulcan was not at fault. It is asserted that if the vessels had kept their courses both remaining silent they would have passed in safety. Conceding this to be so it would be a strange proposition to hold that it is negligence per se for a heavily laden upbound vessel to request the port side of the channel of a descending tug when there is absolutely no question that they can pass safely starboard to starboard. The Genevieve had indicated no preference and it was apparent that they would meet at or near a point where it was necessary for the Vulcan to swing to port in order to make the Grassy Island range.

The two-blast signal from the Vulcan was answered by the Genevieve by one blast, meaning, "I am directing my course to starboard," and her pilot immediately put her wheel to port. This was a cross signal forbidden by rule 26. But the witnesses for the tug assert that they heard but one blast. That two blasts were given is beyond dispute. The master, mate, lookout, engineer and a passenger on the Vulcan all swear positively to this and the subsequent signals.

If it be true that those on the tug did not hear the signal the question arises, why did they not hear? The night was clear, there was no wind, nothing in the elements prevented sounds from being heard, and the Vulcan's whistle, in such circumstances, should have been heard miles away. If it were not heard because those in charge of the tug were deaf, or inattentive or in positions where it was impossible to hear, it was negligence for which the tug is responsible. That

the situation on the tug was somewhat extraordinary in this respect is further evidenced by the fact that no one on the tug heard a two-blast signal which was given at a moment or two before the collision. But in no view of the matter can the Vulcan be charged with negligence because the Genevieve did not hear her signal. The Vulcan blew a proper signal and was answered by an improper signal. She knew then that the Genevieve intended to turn towards the same side of the river as herself and that prompt action only could avoid a collision. The Vulcan again blew two blasts, checked down, blew two more blasts and reversed. When the collision occurred the Vulcan had almost come to a standstill. The blow to the scow was a light one; it was hardly felt on board the Vulcan who received no injury save a cracked plate at the bow.

There were but two affirmative acts on the part of the Genevieve and both were wrong. She gave the wrong signal and turned in the wrong direction. No signal was given to the engineer of any kind and the tug kept on at full speed in defiance of rule 26, which commanded her master "to reduce his speed to bare steerageway, and, if necessary, stop and reverse." The excuse for this uncontradicted violation of the law is that the danger was so imminent that it would have done no good to stop and reverse. Having disobeyed the law the onus is strongly upon the tug to establish the truth of this proposition. This she has not done; on the contrary it is quite clear that if there had been any collision at all it would have been so slight as to cause little or no damage.

It will be remembered that the Vulcan checked and reversed in rapid succession as soon as the peril became apparent, and yet it is charged against her as a fault that she did not do this sooner. "The Vulcan was in fault," says the brief, "for not stopping and reversing immediately upon getting the single blast. The mate did not stop to reverse, he merely checked, and it was only after he had repeated his signals that the engines of the Vulcan were reversed upon the captain's order to the mate. This was inexcusable."

To the mind of the court it seems somewhat inconsistent to assert, on the one hand, that the delay of a few seconds in reversing was inexcusable fault on the part of the Vulcan and, on the other, that the Genevieve, with the same danger confronting her, was absolutely free from fault although she did not check or reverse at all but rushed ahead at full speed.

Upon the proof there can be no question as to the negligence of the tug. Two open and flagrant violations of law are established without dispute. She omitted the signal required by rule 24; she failed to reduce her speed, stop and reverse, as required by rule 26. It is, therefore, unnecessary to examine the other faults alleged against her.

An able and ingenious argument is advanced on behalf of the tug to convince the court that the Vulcan should be inculpated also. The faults charged against her are as follows: First. That she crowded upon the course of the tug. Second. That after giving the first signal she should have waited till the tug answered before changing her helm. Third. That the second signal of two blasts was a cross

signal forbidden by the rule.    Fourth. That she did not reverse soon enough.    Fifth. That she did not sound an alarm.    Sixth. That she did not keep out of the way of the tug.    Seventh. That she should have signaled, if at all, for the right instead of the left side.

Some of these accusations have already been answered, others are based upon the hypothesis that the court will accept the uncertain and, in some respects, contradictory statements of the two witnesses for the tug, denied as they are by the witnesses for the Vulcan, and others still are unimportant for the reason that by no possibility could the omissions have changed the result.    The entire testimony has been read with the result that the court is unable to point out any act or omission of the Vulcan which, considering the well-recognized rules of maritime law, can be regarded as a fault. Both Capt. Pratt and Capt. Day admit their unfamiliarity with the navigation of the Detroit river.    Their lives as mariners have been spent principally upon other waters and their trips on the river of late years have been casual and infrequent.    The statement made by Capt. Pratt at Detroit, immediately after the accident, differs, in at least two important particulars, from his testimony in court.    It is thought that an impartial reader of the record will find it impossible from the testimony of these two witnesses to locate with accuracy the course of either vessel after they came within sight of each other. It is conceded on all hands that after the tug replied with one blast and put her wheel a-port, the danger was so near that the rule of in extremis applies.    Both Pratt and Day testify that when they heard the second signal from the Vulcan they could do nothing to avert the accident; they had turned to the right and could not get back again. The signals from the Vulcan at this time were, in fact, an alarm. They were two blasts followed immediately by two more blasts.    In this way the Vulcan was enabled to convey to the tug not only the idea of immediate danger, but also the information that the Vulcan was swinging to port, and so those on the tug understood it.

The Vulcan must be judged not in the light of the facts as they now appear but in the light of the facts as they appeared to her master and mate as they stood upon her pilot house on the morning in question.    The conduct of the tug was surely sufficient to puzzle the most accomplished and prudent mariner and the court is convinced that the Vulcan did everything which was possible in the circumstances to prevent the collision.    The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211.

The Lorain Steamship Company, the owner of the Vulcan, is entitled to a decree.