## THE MARY MANNING.

## THE JENNIE C. MAY.

(Circuit Court of Appeals, First Circuit. January 10, 1900.)

Nos. 275, 276.

COLLISION—DETERMINATION OF FAULT—EVIDENCE CONSIDERED.

Evidence considered, and *held* to establish that a collision between two schooners meeting in the evening was caused by the vessel having the right of way changing her course after the vessels were within sight of each other.

Appeal from the District Court of the United States for the District of Massachusetts.

Eugene P. Carver (Edward E. Blodgett, on the brief), for appellants. Arthur H. Russell and Charles T. Russell, for appellees.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

COLT, Circuit Judge. These appeals relate to a collision between the schooner Jennie C. May and the schooner Mary Manning, which took place off Nauset Light, Cape Cod, on January 1, 1896. The May was a three-masted schooner of 745 tons net register, loaded with a cargo of coal, and bound on a voyage from Baltimore to St. John. The Manning was a four-masted schooner, 1,130 tons net register, bound on a voyage from Salem to Philadelphia, without cargo. The time of the collision was between 5:15 and 5:30 p. m. The weather was fair. The wind, by the preponderance of evidence, was W. N. W.

According to the account of the May, at the time the Manning was sighted, she was sailing closehauled on the port tack, steering N. by W., and making about five knots an hour. There was a competent man at the wheel, and a vigilant lookout. The proper side lights were set and burning, and all hands were on deck. While so proceeding, the lookout reported a vessel, which proved to be the Manning, right ahead. Soon afterwards the sails and side lights of the Manning were seen about half a point on the lee or starboard bow, indicating a vessel approaching sailing free. The May held her course, but the Manning, instead of changing her course and keeping out of the way of the May, held her course, and continued to approach until the two vessels were in imminent danger of collision. The May thereupon, just before the collision, for the purpose of avoiding it or easing the blow, put her wheel down two or three spokes, and immediately, before any change in her course, seeing that the Manning had suddenly luffed, put up her wheel. The vessels almost immediately came together, the Manning striking the May on the port bow, almost a head-on bow. According to the account of the Manning, she was heading south on the starboard tack, going six or seven knots an hour, with her side lights properly set and burning brightly, a competent man at the wheel, and a vigilant lookout forward, and both her master and mate on deck. While so proceeding, the red light of a sailing vessel, which proved to be the May, was seen about a point off the port bow. The red light was duly reported, and continued to bear on the port bow, when suddenly the May changed her course, swinging to the westward and showing both lights, and then showing only her green light; whereupon the mate ordered the helm of the Manning hard a-port. The May then swung to starboard, and struck the Manning forward of the forerigging on the port side.

Upon the question which vessel was at fault, the contention of the May is that, after she saw the Manning, she made no change of course, except a slight luff in extremis, when the collision was in-

evitable, and that, having the right of way, the cause of the collision was the failure of the Manning to keep clear of her. The contention of the Manning is that the collision was caused by the May suddenly changing her course to the westward, and coming up into the wind, whereby she exposed her green light.

It is admitted by the May that she did make such a change of course for the purpose of hauling in her sheets, and the important question to be determined is whether, upon the evidence, this maneuver took place before she saw the Manning or the Manning saw her. If the contention of the Manning on this point is correct, the cause of the collision is made clear.

The libel of the May alleges that the collision took place "at about 30 minutes after 5 o'clock in the afternoon." The answer of the Manning alleges that it was "after 5 p. m." Capt. St. John, of the May, in his testimony, makes the time "20 or 21 minutes past 5." The vessels were approaching each other at the rate of some 12 miles an hour. Consequently, the time that would be taken to sail the distance of 2 miles, at which the side lights of a sailing vessel could be seen, would be about 10 minutes. This would make the time when the May first saw the Manning about 5:10.

Capt. St. John's statement of the May's change of course to haul in her sheets may be summarized as follows: A little before sundown the May went off two points to N. E. by N. ½ N., so as to increase his distance from the shore about a quarter of a mile. (This would mean, on the course given, that she sailed about a mile, which, at the rate she was going, would take 10 or 12 minutes.) The May then came up into the eye of the wind for the purpose of hauling in her sheets, which took about 5 minutes, and she then proceeded N. by W., closehauled on the port tack. His side lights were set 15 minutes after sundown, or about 5 o'clock, and he put his wheel down, and hauled in his sheets after sundown, and before the lights were set. He did not see the Manning until 10 minutes after the lights were set. Capt. St. John's statement, that this change of course and hauling in the sheets took place before the lights were set, or before 5 o'clock, and that the Manning was not seen until after the lights were set, is corroborated by the boatswain, Smith, who was acting as mate, and by Buckley, the lookout.

But this account does not agree with the testimony of other persons on board the May. It is not confirmed by the evidence of Capt. Parker, of the schooner Du Vignon, whose vessel was in the vicinity, and who was called as a witness by the May. It is also in direct conflict with the account of the witnesses on the Manning. According to Capt. St. John, the May hauled in her sheets (or made the change of course seen by the Manning, which immediately preceded) at least 10 minutes before the Manning was sighted. On the other hand, two of the sailors on the May, who were engaged in hauling in the sheets, testify that the Manning was seen during the time the sheets were being hauled in. Johansen, who was called on deck to haul in the sheets, says:

"Q. When did you come on deck that afternoon,—what time? A. Well, I could not tell you what time. but, by my judgment, I think it was a little be-

fore half past five. Q. What did you do after coming on deck? A. I came on deck. I went up to the mizzen topsail clew line. I hear the captain sing out to haul the sheets flat. Q. Then what did you do after that? A. After we was finished with the topsail clew line, some other fellows hauled the sheets tight. I went up into the mizzen rigging to make the topsail fast. Q. Now, at that time, did you see the approaching schooner? A. Yes, sir. Q. At that time did you hear any report? A. I heard somebody sing out, 'Vessel ahead!' She was on the starboard side of us. Q. Where were you then? A. I was up in the mizzen topsail crosstree, sir. Q. What were you doing? A. I was furling the sail fast. Q. When you heard the vessel reported, did you see her? A. Yes, sir. Q. Where were you when you heard the lookout report the schooner? A. I was up in the rigging the first time I heard it. Q. Was that before or after they had finished hauling the sheets in? A. That was before they was finished hauling the sheets in."

Knutsen, another sailor, who came on deck to help haul in the sheets, says:

"Q. What were you doing when she was reported? A. I was after clewing up the mizzen topsail then. Q. Where were you on deck? A. I was aft then, and then we went forward when we were clewing up the fore-topsail. Q. Where did you see this vessel approaching? A. On the starboard bow. Q. What did you see of her? A. I see her two lights. Q. After that did you go forward? A. Yes, sir; after that we went forward, all of us. Q. And you were then clewing up the fore-topsail? A. Fore-topsail? Yes, sir; and me and the mate went on forecastle deck. The man on lookout was going to make the foretopsail fast, because it was his watch on deck. Q. Did you hear the man on lookout report a vessel? A. I did, sir. Q. Where were you? A. I was 'midships then. I heard him twice report it. He sung out, 'I see a vessel, but I cannot see the lights.' That was at the time I was hauling in the sheets. Q. That was at the time you were hauling in the main sheets? A. Yes, sir. Q. That was the time you were hauling in the main sheet you heard the man on lookout say— A. 'I see a vessel, but cannot see any lights on her.' Q. That was the first time you heard her reported? A. Yes, sir. Q. Then you heard her reported a second time, didn't you? A. Yes, sir. Q. What were you doing when you heard her reported the second time? A. Clewing up the mizzen topsail."

Oelsen, the man at the wheel, testifies that it was only about a quarter of an hour before the collision that the sheets were hauled in:

"Q. At the time of the collision, where was the captain? A. He was aft, sir. Q. How long had he been on deck? A. On deck about twenty minutes before the collision. Q. How many other men on deck? A. All hands, sir. Q. What were they doing? A. About a quarter of an hour before the collision we hauled in the sheets, hauling them in fore and aft. Q. How many men clewing up the sails or hauling in the sheets? A. Four of us. Q. Was any change made in the course of the vessel to haul in the sheets? A. We had to keep her off the shore about north by east half east, to get more room to haul in the sheets. Q. After you went off, what did you do with the wheel? Did you come up into the wind? A. The captain took the wheel then. Q. What did he do with it? A. He came up into the wind. Q. That was how long before the collision? A. Fifteen minutes."

Capt. St. John, in his testimony, admits he gave an order to the mate in regard to clewing up the sails after the Manning was sighted:

"Q. Did you give him [the mate] any orders in regard to the sails then [after the Manning was seen]? A. Well, about the time that he got on the bridge, going from the poop deck to the house,—the forward house,—I ordered him to clew up the fore-topsail. Q. What did that require to do? A. Well, cast off the halyards and sheets, and haul in on the clew lines. Q. That would be forward, of course? A. Yes, forward. Q. Do you know whether he obeyed that order? A. I heard the topsail halyards rattling immediately afterwards."

The mate's testimony, to the same effect, is as follows:

"Q. In going forward, did you get any order from him [the captain]? A. Yes, sir. Q. What was that? A. He told me to clew up the fore-topsail. Q. What did you do then? A. I ordered a man to let go the halyards."

The clewing up of the fore-topsail, which Capt. St. John and the mate say took place after they saw the Manning, seems to have been a part of the operation of hauling in the sheets. On this point the testimony of Knutsen is instructive:

"Q. In the first place, you hauled in the main sheets? A. Yes, sir. Q. Then you went forward to haul in the jib and staysail sheets, and then went aft to clew up the mizzen topsail? A. Yes, sir; the mizzen topsail was partly clewed up. We had to clew it up better. Q. As soon as you got through pulling in the jib and staysail sheets, you went to help clew the mizzen topsail up? A. Yes, sir. Q. Finished it? A. Yes, sir. Q. Then you and the mate went forward to clew up the fore-topsail; is that right? A. Yes, sir."

Again, on the important point whether the sheets were hauled in before the lights were set, Capt. St. John is directly contradicted by his own witnesses. He testifies that the sheets were hauled in before the lights were set, and that the Manning was not seen until 10 minutes after the lights were set. On the other hand, Knutsen testifies as follows:

"Q. Were you on deck when the side lights were put up? A. No, sir; I was below then. We were called out to clew up the sheets and haul in the topsail. Q. When you came on deck to haul in the sheets, the side lights were all set? A. Yes, sir. Q. And they were set when you came up on deck, and before you hauled in the sheets? A. Yes, sir. Q. Positive of that? A. Yes, sir; I am sure of that."

Johansen also testifies as follows:

"Q. You and Knutsen were in the same watch? A. Yes, sir. Q. You came on deck at the same time? A. I came a little before him. Q. And you at once went to clew up the mizzen topsail? A. Yes, sir. Q. Did you have your side lights up at that time? A. Yes, sir; I was not on deck when they put them up, but I know they was up."

The testimony of Capt. Parker, master of the Du Vignon, cannot be said to confirm Capt. St. John, but tends to corroborate the account of the Manning that the May must have changed her course to haul in her sheets after she was seen by the Manning.

Capt. Parker was in company with the May that day from 11 o'clock until half past 5. He saw the May change her course, and come up into the wind, but did not see the collision:

"Q. 8. On that afternoon, did you see anything of the Jennie C. May? A. Yes; I was in company with her. Q. 9. For what time? A. From eleven o'clock until half past five. * * * Q. 22. Could you see the vessel? A. Yes, sir. Q. 23. Did you see the collision? A. No, sir. Q. 24. Did you hear the sound of any collision? A. I did not. Q. 25. How far off were you from the May at this time? A. I was somewheres about half a mile. * * * Q. 32. When you last saw the May, how did she bear from your vessel? A. About two points on our port bow. Q. 33. Could you see her sails? A. Yes, sir. Q. 34. What was she doing? A. The last time I saw her, she kept off, and then luffed up into the wind to take her sheets off. Q. 35. You say that you saw him keep off? A. Yes. Q. 36. And then luff up into the wind? A. To take her sheets in. Q. 37. And that was about half past five? A. No, sir; before that time. Q. 38. That was the last you saw of her? A. Yes, sir. Q. 39. How much did he keep off? A. I should say swung his vessel off three or four points. Q. 40. And then he came back on his course? A. No, sir; he came dead up into the wind. Q. 41.

Can you tell what time that was? A. No, sir; I could not within a few minutes. I should think it was somewheres in the neighborhood of five o'clock. Of course, when I saw these things I did not think I should be called upon to testify in this case, and so, consequently, could not swear to the time. Q. 42. But you could see the change of course distinctly, could you not? A. Yes, sir. Q. 43. Did you see him take any sails in at that time? A. I did not. Q. 44. In stating about five o'clock, you would not state within half an hour, one way or another? A. I can state within half an hour, but not within ten or fifteen minutes. Q. 45. It might have been a quarter past five? A. I should hardly think it was as late as quarter past five; somewhere between ten minutes of five and quarter past five. I do not know; that is only from memory. Q. 46. And at that time she came right up into the wind? A. Yes, sir. Q. 47. How close to the wind, should you say? A. Right up, so that her sails were shaking. Q. 48. Well, how many points should you think? A. When you take your vessel up into the wind to take your sheets in, you let her come right up head to the wind. Q. 49. Well, she probably came within two or three points of the wind? A. Within a point or two, I should say, of the wind. Q. 50. At that time you had your side lights up? A. Oh, yes, sir."

An examination of the whole evidence on the part of the May does not support the statement of Capt. St. John that the May changed her course to the westward to haul in her sheets before the approaching vessels were in sight of each other. On the contrary, some of the witnesses on the May confirm the uniform and consistent account of the witnesses on the Manning that the May made such a maneuver after she was seen by the Manning.

To find in favor of the May on this issue, it may be said that we must accept Capt. St. John's account to be correct, although he is contradicted by his own witnesses and by the witnesses for the Manning. We do not feel warranted, upon the evidence, in reaching such a conclusion. This change of course on the part of the May accounts for the collision. That she made this maneuver some little time before the collision is admitted. Assuming that it was made after the Manning sighted her, the evidence from both vessels, as a whole, becomes fairly reconcilable, and the cause of the collision is clear. If, however, we eliminate this factor from the case, it becomes very difficult, upon the evidence, to reach any satisfactory conclusion. If it appears that the May had the right of way, it is also abundantly shown by the record that there was more or less confusion on board of her before the collision, and that she did not have an efficient lookout. On the other hand, the Manning maintained a particularly vigilant lookout and good discipline, so that, on well-settled rules, the presumptions are in favor of the proofs coming from her master and crew. Upon full consideration of the evidence, we think that this change of course on the part of the May took place after she was seen by the Manning, and that this maneuver on her part was the cause of the collision.

In No. 275 (The Mary Manning) the decree of the district court is reversed, and the case is remanded to that court, with instructions to dismiss the libel, with costs, and the appellant recovers the costs of appeal.

In No. 276 (The Jennie C. May) the decree of the district court is reversed, and the case is remanded to that court, with instructions to enter a decree for the libelants, with costs, and the costs of appeal are awarded to the appellants.