## THE LIVINGSTONE et al.

(Circuit Court of Appeals, Second Circuit. January 14, 1902.)

### No. 83.

1. COLLISION—CONTRIBUTORY FAULT—BURDEN OF PROOF.

Where fault on the part of one vessel for a collision is established by uncontradicted testimony, and such fault is of itself sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel, but any reasonable doubt as to whether the fault of the latter contributed to the collision should be resolved in its favor.

2. SAME—STEAMERS MEETING—CONTRIBUTORY FAULT.

The steamers Grand Traverse and Livingstone met in Lake Erie in the early morning, shortly before daylight, being on practically parallel courses. The night was clear, and they saw each other when four miles apart. When a mile and a half apart, and again when a mile and a quarter of a mile, the Traverse signaled her intention to go to the right, each time porting half a point, but she received no answer to her signals, the last only being heard by the Livingstone, which thereupon starboarded her helm, and a collision resulted. When the last signal was given and heard the vessels were in a position of safety, and had the Livingstone ported, as she should have done, or even kept her course, there would have been no collision. *Held* that, the navigation of the Traverse having been correct in all respects, neither the fact that her port light had gone out, nor that her lookout had temporarily left his post after the vessels had sighted each other, could have misled the Livingstone or contributed to the collision, which was due solely to the Livingstone's change of course after the signal of the Traverse was heard and understood; nor was the Traverse chargeable with contributory fault in failing to stop and reverse in the brief time remaining after the unexpected change of course of the Livingstone first created a situation of danger.

Appeal from the District Court of the United States for the Western District of New York.

This cause comes here upon appeal by the owners of the Grand Traverse from a decree of the district court, Northern district of New York, holding both vessels in fault for a collision between the steam propeller Livingstone and the steam propeller Grand Traverse, and dividing the damages. 104 Fed. 918. The Livingstone did not appeal.

Harvey D. Goulder and John G. Milburn, for appellants.

C. E. Kremer, for appellee the Livingstone.

F. H. Canfield, for appellee Insurance Co.

Before WALLACE and LACOMBE, Circuit Judges, and TOWN-SEND, District Judge.

LACOMBE, Circuit Judge. The general facts of the collision are succinctly set forth in the opinion of the district judge, as follows:

"The collision occurred about half past five on the morning of October 19, 1896, when the steamers were on Lake Erie about a mile N. W. of Colchester Light, Ontario. The Traverse, a propeller 182 feet long and 33 feet beam, loaded with coal and merchandise, was proceeding up the lake on a voyage from Buffalo to Green Bay, Wis. Her course was W. by N. ¾ N. Her speed was about 8½ miles an hour. The Livingstone, a propeller 280 feet in length and about 38 feet beam, loaded with corn, was proceeding down the lake on a voyage from Chicago to Buffalo. Her course was E. by S. ½ S. Her speed was about 10½ miles an hour. The two vessels were thus on substantially opposite courses. The wind was blowing fresh from the west. Though dark at the time of the collision it was clear, and objects could be seen at a considerable distance. It was almost daylight. About half a mile ahead of the Livingstone was the Peshtigo, a propeller smaller and slower than the Livingstone, bound down the lake, substantially on the same course. Just prior to the collision she passed the Traverse about a quarter of a mile to the northward. The members of her crew on watch at the time heard the signals given by the Traverse and saw the vessels when they came together. The collision occurred in the open lake, with plenty of room in which to maneuver, and with nothing in the condition of the wind or water to render navigation difficult."

As to the fault of the Livingstone, the district judge found:

"When the vessels first sighted each other they were about four miles distant. Their masthead lights were first seen. They were then meeting nearly end on, and rule 17 [which requires that each shall alter her course to starboard so that each shall pass on the port side of the other] became applicable. When about a mile and a half distant the Traverse saw the red and green lights of the Livingston, and blew one blast, as required by rule 23, to indicate that she was going to the right. She ported half a point. This was correct seamanship. The Livingstone did not answer this signal, and continued on her course. The first mate of the Livingstone, who had charge of her navigation at the time, testifies that he did not hear this signal; in fact, no one on the Livingstone heard it, if the testimony of her crew is to be accepted. There is nothing at all improbable in this story. The whistle of the Traverse was clogged with water. Her mate testifies that he blew an unusually long time before he could get a distinct response, and as the wind was blowing the sound directly away from the Livingstone it is not surprising that it was not heard. When the vessels were from three-quarters of a mile to a mile apart, the Traverse, seeing at that time only the range and red light of the Livingstone, repeated the signal, and again ported half a point. There was no response from the Livingstone. When the distance had been reduced to a quarter of a mile, the Traverse blew a signal of one blast, and ported a third time. This signal was heard by the Livingstone, but still there was no answer. Assuming the Traverse to be guilty of all the faults charged against her, what

was the situation at the time the third signal was given? The vessels were then about a quarter of a mile apart. Each could be seen by the other without the aid of lights. The Livingstone knew that the Traverse was directing her course to starboard. She knew it from the signal, and it was perfectly obvious without the signal. * * * What then was the manifest duty of the Livingstone? There can be no doubt that she should have ported also. Even had she kept her course, there could have been no danger. There was but one thing possible for the Livingstone to do at this time to bring the boats into collision, namely, to starboard, and that was the one thing she did do. The proof establishes this proposition beyond a doubt."

It is unnecessary to discuss such proof here, for by not appealing the Livingstone has conceded that the court was correct in finding that she did starboard at this time, and that by such starboarding the collision was brought about. It was, no doubt, an amazingly stupid piece of navigation, but not unprecedented. Whether the mate called out "Starboard" when he meant to say, and possibly believed he did say, "Port," or whether the wheelsman heard the order "Starboard," and did the opposite, we do not know. Such things have happened before, and an appreciation of the extent of human infirmity, even among men experienced and ordinarily cautious, makes us unwilling to accept the theory of the court below that no navigator could have committed such an error (assuming him to be sane and not intoxicated) unless in some way or other the other vessel misled him. We approach the consideration of the faults charged against the Traverse, therefore, without the postulate that an accident of this character, where the one vessel is concededly guilty of such gross fault, "could hardly have occurred without the concurring carelessness of the other." On the contrary, we understand the rule as laid down by the supreme court to be that where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption, at least, adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor. The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 37 L. Ed. 84; Ludvig Holberg, 157 U. S. 60, 71, 15 Sup. Ct. 477, 39 L. Ed. 620; The Umbria, 166 U. S. 404, 409, 17 Sup. Ct. 610, 41 L. Ed. 1053.

The first fault charged against the Traverse is that she displayed no red light. The district judge discussed all the testimony on this branch of the case, and, giving the greater weight to that of the observers on the deck of the Livingstone, reached the conclusion that the Traverse was thus in fault. In our opinion, the testimony from the Livingstone is not as strong as it might be. Witnesses who observed the Traverse just after collision testified that there was no lantern before the red screen. Had they said the lantern was there and unlit, they would more strongly have corroborated the testimony of the navigator, whose evidence on other points the district court discredited, as we do. The evidence shows that the lantern was put in place at the proper hour, and was observed afterwards before collision. It may have gone out, but certainly it was not removed from the

screen before collision. However, we do not think it necessary to discuss the evidence on this branch of the case, nor, on the whole, are we disposed to reverse the finding that the Traverse was not displaying her red light; but we are unable to concur in the proposition that such fault was instrumental in producing the collision. The district court found that when the vessels were a quarter of a mile apart, and the third whistle of the Traverse was heard on the Livingstone, the vessels were in a position of safety, which could be made unsafe only by the starboarding of the Livingstone. Had the latter ported, or even held her course, there could have been no danger. The vessels would have passed each other with a broad margin of safety. The witnesses from the Livingstone unite in the proposition that the position then was one of safety, though some of them put the Traverse on their starboard instead of their port bow, and one of them, the mate, insisted that he ordered no change of wheel, and that none was made. As before stated, he was discredited by evidence from the deck of his own vessel, the wheelsman testifying that the mate ordered the wheel hard a-starboard; that he put it there, where it remained down to collision; and that the captain, coming on deck, then found it hard a-starboard, which the captain did not deny. The testimony overwhelmingly supports the proposition, stated in the opinion of the district court, that "the Livingstone took a sharp swing to port when the last signal was given from the Traverse, and when, * * * had she held her course or directed it to starboard, the accident would not have occurred. * * * If the Livingstone had not starboarded at this supreme moment, she would have passed the Traverse without difficulty." This is the only fault which the district court finds on the part of the Livingstone, and, that vessel not having appealed, the accuracy of that finding is conceded. But at the moment the last signal sounded, and before the mate of the Livingstone ordered her wheel hard a-starboard, the vessels were a quarter of a mile apart. He could see the Traverse, while her signal notified him as plainly as any lights would have done that she was directing her course to starboard. Indeed, when pressed upon cross-examination, this witness admitted that the one whistle heard by him gave him all the information needed, and that the absence of the red light made no difference. Of this statement it is said that it was made by a witness who did not commend himself to the court, and whose narrative in other particulars was found to be untruthful; but the situation itself gives sufficient support to this admission of the mate. Any intelligent man must have known from the whistle in what direction the Traverse was going to swing, and no light was needed to tell him that if he starboarded he would bring his own boat into peril. If failure by the Traverse to display a red light had put the vessels (as a consequence of navigation prior to sounding of the last signal) "in a position of danger, where the slightest fault might bring disaster," her failure in that regard might fairly be held to have contributed to the catastrophe. But it must be accepted that the position when the last signal sounded was one of safety, and that peril and disaster came thereafter only as the result of an amazing piece of stupidity in the navigation of the Livingstone.

For this reason we cannot hold that failure by the Traverse to display a red light was a fault contributing to the disaster.

It is further charged that the Traverse displayed no range light on her mizzen mast or main mast. The testimony to support this proposition is less persuasive than that touching the absence of a red light, but it need not be discussed, because, conceding the fault, it did not contribute to the accident, for the reasons already set forth.

It is further charged that the Traverse had no lookout. The facts are these: When the Livingstone was sighted the Traverse had on deck her navigator (the mate), wheelsman, and stationed lookout. The lookout saw the masthead lights of the Livingstone before the first signal, and reported them. He then took the wheelsman's place (the latter being sent aft to examine the log), and remained there till collision. No other vessel interfered in any way with the navigation of either of the colliding vessels. No other was visible except the Peshtigo, far out of reach, and which was also reported long before collision. The Livingstone was sighted and seen by all when miles away. Her colored lights were made out a mile and a half off, signal of one whistle blown to her, and the navigation of the Traverse conducted with reference to her. The view was clear and unobstructed, and, so far as the evidence shows, nothing of any character or description occurred concerning the approach of the Livingstone of which the navigator of the Traverse was not advised from personal observation. Under these circumstances, we are not prepared to say that the absence of a lookout contributed to the injury. The Victory and The Plymothian, 168 U. S. 429, 18 Sup. Ct. 149, 42 L. Ed. 519.

It is further charged as a fault that the Traverse did not stop and reverse. Under the findings of the district judge, in which we concur, the position of the two vessels was one of safety, until the unexpected starboarding of the Livingstone. Up to that time, therefore, no rule required the Traverse to stop and reverse, and afterwards she was so near the jaws of collision that, in view of the gross fault of the Livingstone, she should not be held liable for an error of judgment committed in the brief moment allowed her navigator to decide, especially as it seems highly probable that she would not thereby have averted collision.

The decree of the district court holding the Grand Traverse liable is reversed, with costs of this appeal, and cause remanded, with instructions to hold the Livingstone solely in fault.