## THE EAGLE WING.

(District Court, E. D. Virginia. February 23, 1905.)

1. COLLISION—DETERMINING FAULT—CHARACTER OF WITNESSES IN CONFLICT.
    Where the testimony on behalf of one of two vessels in collision as to what was done on such vessel is clear and positive, or is given by men who are intelligent, experienced, and apparently reliable, while that on behalf of the other as to what was done thereon is conflicting or is given by witnesses who are ignorant or inexperienced and manifestly unreliable, such facts must be taken into account in weighing the testimony and determining which vessel was in fault.

2. SAME—PRESUMPTION FROM VIOLATION OF STATUTE.
    Where the navigation of one of two vessels in collision was at the time in charge of an unlicensed mate, in violation of the positive provisions of Rev. St. § 4438, as amended by Act Dec. 21, 1898, c. 29, 30 Stat.

764 [U. S. Comp. St. 1901, p. 3034], there is a presumption that such fact caused or contributed to the collision, and the vessel has the burden of showing that it could not have done so.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, § 257.]

3. SAME.

While there is a presumption that the privileged one of two meeting vessels, which came into collision, obeyed the law and kept her course, yet, when such presumption is overthrown, and her fault is clearly established, and is in itself sufficient to account for the collision, she can only avoid full liability by proving the fault of the other vessel beyond reasonable doubt.

4. SAME—SAILING VESSELS MEETING.

A collision at sea in the night between two meeting schooners *held*, on conflicting testimony of their respective officers and crews, to have been solely due to the fault of the privileged vessel in changing her course just previous to the collision.

In Admiralty. Suit for collision.

Hughes & Little and James D. Dewell, Jr., for libelant.
Carver & Blodgett and R. G. Bickford, for respondent.

WADDILL, District Judge. The schooner Hargraves and the schooner Eagle Wing were in collision in the Atlantic Ocean on the morning of the 19th of February, 1903, about 1:30 o'clock, at a point off the Jersey coast between Absecon Light and Tucker's Beach Light, some eight miles out from Absecon Light, from which the Hargraves received such injuries that she sunk very soon thereafter, and proved a total loss. The Hargraves was a four-masted schooner, 696 tons net register, 173 feet long, 39 feet beam, 18 feet 6 inches depth of hold, and at the time of the collision was en route from Port Norfolk, Va., to Providence, R. I., with a cargo of 1,203 tons of bituminous coal. The Eagle Wing was a four-masted schooner, 1,079 tons net register, 209 feet 7 inches long, 40 feet 1 inch beam, and at the time of collision was en route from the port of Boston, Mass., to the port of Newport News, Va., light, for orders. On the night of the collision the wind was blowing strong from the northwestward, and at times shortly after midnight the weather was squally, puffy, with occasional flurries of snow, but about the time of the collision was clear, with the moon shining brightly, and good weather for seeing lights. The Hargraves was proceeding up the coast, as claimed by her, on the proper course of N. N. E., with jib, staysail, foresail, and single-reefed spanker, with the mizzen fast, and the wind free, or very nearly so, on the port tack, when the lookout discovered a red light on the port bow, some distance away, which was also seen by the mate and by the man at the wheel. Shortly thereafter the light appeared to brighten, its bearing apparently not changing, when the Hargraves mate ordered the wheel put up, to keep off and give the approaching vessel more room, which was done; and thereafter, as the vessels proceeded, the approaching vessel, which proved to be the Eagle Wing, suddenly changed her course, opened up her green light, and almost immediately thereafter came into violent collision with the Hargraves, striking her bows on, on her port quarter, at the mizzen chain

plates, causing the injuries sued for. Whereas, the Eagle Wing's contention is that as she was proceeding down the coast on a course about S. W. to S. W. ½ W., by compass, closehauled on the starboard tack, with the spanker taken in and reefed, and her foresail reefed, and proceeding with her lower and three head sails, the wind at the time blowing heavily from the W. N. W., her lookout reported a vessel head on, a little on the starboard bow, which proved to be the Hargraves, sailing on the port tack, with the wind free, and that her mate, finding these facts to be true, and knowing it was the duty of such vessel to keep clear of him, returned to the quarterdeck; that soon after the approaching vessel was seen to change her course, showing her red light, and going directly across the bow of the schooner Eagle Wing, which at all times held her course; the two vessels being then so near together that it was impossible for those on the Eagle Wing to do anything to prevent the collision, which occurred about 1:30 a. m.; the Hargraves striking the Eagle Wing a glancing blow on her port side; the port bow of the Eagle Wing striking the port side of the Hargraves abaft amidships.

The question to be determined is, the theory of which vessel shall be accepted, as manifestly no collision would have taken place if the vessels approached each other as claimed by them, unless one of them kept off, and crossed the course of the other. In other words, the Hargraves' contention is that the vessels were meeting with their lights red to red, and that the Eagle Wing suddenly shut in her red and exposed her green light, and got across her course; and the Eagle Wing says they were approaching green to green, and the Hargraves suddenly shut in her green and exposed her red, and crossed under her bows. It is conceded that, under the theory of either vessel (article 17a, Rules of Navigation, c. 4, 30 Stat. 100 [U. S. Comp. St. 1901, p. 2869]), the Eagle Wing, sailing closehauled, and the Hargraves with the wind free, was the favored vessel, charged with the duty of keeping her course, and that the duty was imposed on the Hargraves of keeping out of her way; and it may likewise be said that the presumptions are favorable to the view that the favored vessel, as distinguished from the one upon whom the burden of keeping out of the way rested, did not change her course.

While, however, the Eagle Wing is thus favored, with the presumption of having maintained her course, it does not follow necessarily that she did not change the same, or that she should not be held responsible for the collision because it would have been a foolish thing for her to have done so. Just what, as a matter of fact, was done, is the crucial question to be ascertained, and this can only be determined from a full review and consideration of all the facts of the case.

The evidence is quite voluminous, most of which was taken orally before the court, and considerable by deposition in advance of the trial. Still, the witnesses who saw and observed the collision are not many; and while, as to them, as, indeed, to all the witnesses examined, the examination and cross-examination was un-

usually long, the essential features of the evidence are within a comparatively narrow compass. The collision having occurred in the dead hour of the night on the high seas, with no other shipping near by, only the crews engaged in the navigation of the two vessels can give any accurate account of the actual occurrences at the moment of and immediately preceding the collision. The collision took place during the mates' watches on the respective vessels, with the mates of each in control of the navigation, and with a lookout on each vessel; the Eagle Wing having two seamen at her wheel, and the Hargraves one. No other persons were on the decks of either vessel. The mates and lookouts of each vessel give detailed accounts of what they saw and observed. The wheelsman of the Hargraves was not examined, and the wheelsmen of the Eagle Wing, while examined, only testified as to the movements of the helm of their vessel; not having seen and observed the Hargraves until the two vessels were in collision. The masters of both vessels were below, and each came on deck on account of the possible danger of collision, from what they heard in the cabin. The Hargraves master got out in time to see the collision, and the course and lights of the respective vessels before coming together, whereas the Eagle Wing's master did not reach the deck of his ship until after the moment of impact. It will thus be seen that we have chiefly to rely upon the evidence of the master, the mate, and the lookout on the Hargraves, and the mate and lookout on the Eagle Wing, as the persons who saw the movement of the vessels before and at the moment of collision.

After most mature and careful consideration of the evidence of these witnesses, as well as that of all the others examined, and in the light of all the circumstances of the case, aided by opinions of experts, the exhibition of diagrams, and the elaborate argument of accomplished proctors, the court's conclusion is that the Eagle Wing was the guilty vessel, and the collision was the result solely of her not keeping her course, but, on the contrary, changing the same, and running across the course of, and into collision with, the Hargraves, at a time when it was too late for the latter vessel to avoid the collision, and after she had been led by the movements of the Eagle Wing to suppose that she would keep on her course. The law imposed upon the Eagle Wing to keep her course, and the Hargraves had the right to suppose that she would do so, and for the collision arising from such failure she is clearly liable; and the mere fact of the improbability of her not changing her course, because she should not have done so, will not suffice to relieve her. The Mary Buhne (D. C.) 95 Fed. 1002, affirmed 118 Fed. 1000, 55 C. C. A. 494. The authorities are abundant to show that vessels have been held liable for making substantially the same maneuver as was made by the Eagle Wing on this occasion.

The Elizabeth Jones, 112 U. S. 519, 5 Sup. Ct. 468, 28 L. Ed. 812, was a case very similar to the one before the court, where a schooner, the Willis, sailing free, heading E. by N., and the Elizabeth Jones, a bark, heading S. by W. ½ W., wind ½ S., the Willis, having seen the green light of the Jones about half a point on her starboard bow, put

her wheel to starboard and swung off, bringing the vessels green to green, and the Jones, instead of holding her course as required by the rules, ported and ran into the Willis, striking her on the starboard side. The court held the Jones solely in fault for changing her course by putting her wheel to port, following the Willis up, and baffling her efforts to get out of the way.

In this case the Hargraves observed the red light of the Eagle Wing a point or a point and a half on her weather bow, from three-quarters to a mile away, and at once ported her wheel to go off and keep further away from the Eagle Wing; the latter continuing to show her red light under a starboard helm until nearly abreast of the Hargraves' bow, when she suddenly shut in her red light, showed the green for a few seconds, and ran into the Hargraves, striking her at the mizzen chain plates. Had the Eagle Wing continued on her course, there would have been no collision, and any change in the same should have been to have ported, and gone further from, and not nearer to, the Hargraves.

In the case of The Catherine v. Dickerson, 17 How. 170, 15 L. Ed. 233, the Supreme Court held that, with two vessels meeting, one close-hauled, and the other having the wind free, it was the duty of the former to hold her course, and that to have luffed in the wind was an improper maneuver.

In Spencer on Marine Collisions, § 60, p. 154, the author says:

"The duties imposed upon vessels are of a mutual character, and, where the statute directs one to give way to the other, a change of course upon its part is as unlawful as it is for the other vessel to refuse to yield the right of way."

Henry on Admiralty, § 83, p. 283, in considering the rule in regard to the duty of a vessel to hold its course, says:

"On the other hand, where the duty of a steamship, or of a sailing vessel having the wind free, to avoid another, is shown to exist, or a sailing vessel bound to keep her course fails to do so, in respect to an approaching vessel, the presumption of fault arises, and such vessel is bound to satisfy the court that such collision was not occasioned by such breach of the sailing rules."

The Ella Warner (D. C.) 30 Fed. 203; Lawson and Others v. Myrtle (D. C.) 44 Fed. 779; The Mary Manning, 98 Fed. 1000, 39 C. C. A. 377.

All of the probabilities and circumstances of the case strongly point to the Eagle Wing's negligence and to the Hargraves freedom from fault. The navigation of the latter vessel was in charge of a competent mate, the master being present; both seamen of intelligence, of long experience in coastwise navigation; with an able seaman on the lookout, and another at the wheel; and was proceeding with a valuable cargo on board, on the proper and usual track for vessels proceeding up the coast, the wind free, at reasonable speed, under port helm; and, upon sighting the red light ahead on her weather bow, put her wheel hard up, and kept that way with a view of giving the favored vessel on her port side more room. This was manifestly the proper maneuver for her to have made, and the evidence that the two vessels did approach each other red to red strongly preponderates in favor of the Hargraves. It is true that the mate of the Eagle Wing testifies to the contrary, as does her lookout, though the evidence of the latter, in some of its

important features, corroborates that of the Hargraves crew; and they each seek to place the responsibility for the collision on the latter. Still the evidence of neither of them, or of both combined, should serve to outweigh that of the Hargraves' navigators. In the judgment of the court, neither the mate nor lookout on the Eagle Wing can be said to be reliable as navigators or as witnesses, and in many important particulars their evidence is entirely in conflict one with the other. Neither of them was competent for the position he held. The lookout was a boy 18 years old, and did not ship as an able seaman. He had been in the Eagle Wing for some 6 months, and had previously worked on an ocean steamer as mess boy. He was a member of the master's watch, described as a pet of the latter, and who for some unexplained reason appears to have been lookout in the mate's watch at the time of collision, though the mate himself testifies that his lookout was one of two Portuguese in his watch, who could not speak English, and that he could not understand him when he sighted and reported a vessel ahead, and had himself to go forward on that account. The mate was an unlicensed man, and apparently a roaming individual, seeking different kinds of work; and, while he had spent most of his time at sea, and frequently acted as mate of different vessels, he seems never to have previously been placed in control of navigation of, or selected as mate upon, a vessel of the size of the Eagle Wing. On this voyage he was employed to take the place of a drunken mate, and had not been seen by the master before shipping, though it seems that the latter knew him, as he had worked for him several months previously. The mate knew none of the crew, and they were composed of the boy and five Portuguese, at least one of whom was on his first trip on the Eagle Wing, and two of them on their second voyage thereon. The mate, after the collision, upon reaching Newport News, remained with the ship for several days, and suddenly disappeared, and wandered for months from place to place in different states, working part of the time on vessels of different kinds, and was only caught up with several weeks before the trial. Upon his examination he was disinclined to go into details of his mysterious disappearance and movements, but upon being pressed for an answer as to why he left the ship, he said:

"I felt bad enough about this collision. It is the first collision I have ever had in all my going to sea, and I have not wanted to see anybody connected with it since it happened. I have done them injury enough, I suppose. I did not want anybody to come to me and say, 'Why did you do this?' and 'Why didn't you do that?' I have heard enough of that."

If this statement from the Eagle Wing's mate is not to be treated as in effect an admission from him that he considered himself responsible for bringing about the collision, it at least shows, together with his general character and conduct, that there ought to be little difficulty in ascertaining the cause of the collision, with such an individual in charge of navigation of a large oceangoing vessel, especially when to his own unfitness and inefficiency is added that of an inexperienced boy, or a Portuguese whose language he could not understand, as his lookout.

Where the testimony in behalf of vessels in collision is conflicting and uncertain as to what was done upon one vessel, and the testimony

on behalf of the other vessel as to what was done is clear and positive, or where the testimony of one of the vessels comes from intelligent, experienced, and apparently reliable witnesses, and that of the other from ignorant, inexperienced, shiftless, and manifestly unreliable persons, the court in admiralty, as in all other classes of litigation, must take into account the existence of such conditions in fixing the responsibility for the collision. In the case of The Genevieve and The Vulcan (D. C.) 96 Fed. 859, affirmed 106 Fed. 989, 46 C. C. A. 87, it was said, in determining a conflict of testimony as to which of two vessels was in fault for a collision, that the probabilities and presumptions based upon skill, knowledge, and ability of the crews of the respective vessels, which was the best man, and the least likely to make a mistake, should be taken into consideration by the court. The Alabama (D. C.) 17 Fed. 847; The Mary Manning, 98 Fed. 1000, 39 C. C. A. 377; The Livingstone, 113 Fed. 879, 51 C. C. A. 560; The Hartford (D. C.) 125 Fed. 559.

The faults on the part of the Eagle Wing consist not only in error and negligence on the part of her navigators in the management and control of the vessel, but there was an initial fault, serious in its character, in that an important statutory requirement was violated in the selection of the vessel's mate. He was an unlicensed mate, employed contrary to section 4438 of the Revised Statutes, as amended by act of December 21, 1898, c. 29, 30 Stat. 764 [U. S. Comp. St. 1901, p. 3034]; and, moreover, he was a person that it is highly probable would never have been licensed. The duty to observe this statute is imperative, and all must respect it, whether they approve of its wisdom or not; but that it is founded upon the highest considerations of the laws of humanity, looking to the safety of life and limb and the preservation of property, goes without saying. The failure to comply with statutory requirements and regulations has frequently received the severest condemnation of the courts, and, when such an omission is clearly established, the presumption is that it did contribute to the collision, unless the contrary is obviously apparent, and this presumption attends every fault connected with the occurrence; and a further obligation is imposed to show not only that it probably did not so contribute, but that it could not have done so. Pennsylvania v. Troop, 19 Wall. 125, 22 L. Ed. 148; Martello v. Willey, 153 U. S. 64, 14 Sup. Ct. 723, 38 L. Ed. 637; The Bernicia (D. C.) 122 Fed. 886; The Alabama, 126 Fed. 332, 61 C. C. A. 238.

While the doctrine is well recognized that, until overthrown by sufficient evidence, the presumptions are that the Eagle Wing, the favored vessel, held her course, and that suggestions that she did just the reverse are not looked upon with favor (Haney v. Baltimore Steam Packet Co., 23 How. 291, 16 L. Ed. 562, and cases following), still, when such presumption is overthrown, and her fault clearly established, and such fault is within itself sufficient to account for the collision, then she cannot escape liability by raising a doubt in regard to the navigation of the Hargraves, and the latter vessel should have the benefit of any reasonable doubt with regard to the propriety of her management. The Ludvig Holberg, 157 U. S. 60, 15 Sup. Ct. 477, 39 L. Ed. 620; The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053; The

Livingstone, 113 Fed. 879, 51 C. C. A. 560; The Mary Buhne, 118 Fed. 1000, 55 C. C. A. 494, supra.

It follows from what has been said that, in the opinion of the court, the collision occurred by the negligence of the Eagle Wing, and a decree may be entered so declaring.