UNITED STATES v. PORT OF PORTLAND.

(District Court, D. Oregon. March 9, 1908.)

No. 4,856.

1. COLLISION—STEAMER AND DREDGE IN TOW—DREDGE NAVIGATING WITHOUT RUNNING LIGHTS.

The government lighthouse tender Manzanita passing down the Columbia river from Portland after dark came into collision with the dredge Columbia and was sunk. From the Waterford light on the north side the Manzanita took a southwesterly course across toward the Westport light on the south shore, which was the usual course. The dredge which had been at work near Puget Island on the north side of the channel was taken in tow by a tug, made fast to her starboard quarter, and started up the river, as indicated by the evidence, gradually working across toward a point on the south shore some distance above the Westport light. She had 27 pontoons trailing behind extending about 1,000 feet and some carrying lights. She had no lookout and carried no running lights, and owing to her height those of the tug could not be seen from her port side. She had also lowered her cutter which extended under the water 30 feet in her front. The tow moved very slowly against the ebb tide which lasted until about the time of collision, its speed being not more than from 1 to 1½ miles an hour. The Manzanita not being able to see the lights of the tug, and seeing no running lights on the dredge, supposed her to be stationary, and as the evidence tended to show kept a course toward her intending to pass on her starboard side. When within half a mile or less the Manzanita gave a signal of two whistles and stopped. She received no answer, and started ahead at slow speed, starboarding to pass the dredge's bow, but when so passing was rammed by her cutter and sunk. *Held* that the tug and tow were in fault for navigating at night with no lookout nor running lights on the dredge, for not answering the Manzanita's signal, and for keeping the dredge's cutter lowered and projecting beyond her bow; that under the rule that where the fault of one vessel was gross and sufficient to account for the collision any doubts as to the management of the other should be resolved in her favor there was a lack of the clear and convincing evidence required to establish contributory fault on the part of the Manzanita, the long line of pontoons extending toward the north side of the river apparently justifying her in attempting to pass on the other side of the dredge which appeared from her lights to be stationary.

[Ed. Note.—Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

2. SAME—NARROW CHANNEL RULE—COLUMBIA RIVER.

The Columbia river, in the vicinity of the Westport light, is a narrow channel, and subject to article 25 of the Inland Navigation Rules (Act June 7, 1897, c. 5, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), requiring steam vessels when safe and practicable to keep to the side of the fairway which lies on their starboard side.

161 F.—13

3. SAME—DAMAGES RECOVERABLE—LOSS OF SEAMEN'S EFFECTS.

> The United States is entitled to recover as collision damages against a vessel through whose fault a government vessel was sunk for loss of personal effects of its seamen, it appearing that it is its policy and practice to make such loss good to the seamen.

> [Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 291.]

In Admiralty. Suit for collision.

W. C. Bristol, U. S. Atty.

Williams, Wood & Linthicum, for respondent.

WOLVERTON, District Judge. The libelant is seeking by this cause to recover damages sustained on account of a collision between the dredge Columbia, while in tow of the tug McCraken, and the United States lighthouse tender Manzanita. Under orders from the superintendent of the Thirteenth Lighthouse District to proceed in haste to Astoria, the Manzanita left Portland between 12:15 and 1 p. m. on October 6, 1905. While on the way, and at a point a short distance above Westport reach light, the collision occurred of which complaint is made.

The Manzanita is a vessel of 450 tons, 155 feet in length, appraised as serviceable, and at the time was navigating with a full crew of men. The master and second mate were on the bridge, a lookout was at his proper station, the quartermaster at the helm, and an engineer at the engines. The vessel had her running lights lit, a white light at the masthead and another at the stern. She was drawing 11 feet 4 inches aft and 6 feet 6 inches forward. Waterford post light stands on the north bank of the Columbia river, at a bend near Waterford fishery, and is distant from the place of collision about 2.15 miles. On the opposite side of the river, a little more than a mile from the place of collision, is located the Westport stake or reach light. The former stands on a slight eminence, of 60 to 75 feet, and the latter on the level beach, slightly higher than the surface of the water. The accustomed course of navigators in descending the Columbia river is to pass near the Waterford light, continuing beyond from a quarter to a half mile until the light is shut in by the stern, and then to head direct for Westport light; the latter course being southwest by west, or, by some compasses, southwest by west half west, or southwest by half west. After passing in proximity to the Westport light, and beyond for some distance, the course is again changed so as to make the narrow channel running between Puget and Coffee Islands. It is established by the consensus of the evidence that the current of the stream runs near the north bank of the river passing Waterford post light, continuing on in that direction to about Cape Horn, where it sets over toward the Oregon shore, and approaches nearest thereto some distance below Westport light, when it again changes its course across the channel, and makes its way between the islands above designated, that being now the ship's channel for the larger craft. I append hereto a rough map, being laid upon a section of government's chart No. 6,142. The figures representing the soundings are not accurate for the present date, and are not relied upon for data in connection with the controversy:

The dredge Columbia is a craft 265 feet in length, with a frame extending 13 feet in front and a cutter, used for loosening the substance of the bed of the stream, extending 17 feet beyond the frame, thus giving the cutter an extension beyond the prow of the dredge of 30 feet. She had 27 pontoons attached, extending by her stern a distance of from 900 to 1,000 feet. A pipe 30 inches in diameter, used for conveying away the earth and sediment loosened by the operation of the cutter, was carried back over these pontoons. When the dredge is at work the pontoons stand in line with the current, but when navigating they trail behind the dredge. On the morning of the collision the dredge had been in operation at a point between half and three-quarters of a mile up the river from Coffee Island, and within 200 feet of the Puget Island shore. At about 4 o'clock p. m. she was taken in-tow by the tug McCraken, and began her course up stream, with her destination at Doublebower. The tug was made fast to the dredge on her starboard quarter aft, there being a scow attached in front of the tug, and another on the opposite or port side of the dredge. The dredge carried no running lights, but it had in place an electric white light above the pilot house, and two lanterns attached beneath the electric light, and her state and working rooms were lit up; besides which she carried seven lights distributed upon the pontoons aft. The tug was provided with running lights and the usual masthead and aft lights. The dredge's upper deck was more than 25 feet, and her pilot house 27 feet 6 inches, above the water, while the tug stood about 21 feet above. The time that the collision occurred is variously stated as from 6:30 to 6:50 p. m., the night being dark, but clear. The point of collision is about 3¾ miles distant from the place where the dredge began her voyage. The tide was ebbing at 4 p. m., but at the time of the collision had turned, and was flooding slightly. These constitute in the main the general features of the situation about which there is but slight, if any, dispute.

To understand further the situation, as nearly as it can be ascertained from the conflicting evidence, we will have to pay attention to the salient parts of the testimony of the principal witnesses for the respective litigants. Patrick J. Byrne, who was master of the Manzanita, testifies that the collision occurred about 6:45 p. m.; that the Manzanita was run into and sunk by the dredge Columbia; that she was struck by the cutter of the dredge about the starboard fore rigging, which stove a hole in her, by reason whereof she sank immediately; that when he came to the Waterford light—that is, abreast of it, and about 350 feet distant, as he afterwards explains—he headed for Westport light, on a course approximately southwest by west, except that he might have found it necessary to head the ship a little southward on account of the current, which was then strong; that he had just passed the Waterford light when he first saw the dredge; that he could see the dredge very plainly, and the pontoons stretched across the starboard side of the channel down towards Puget Island; that he could not make out the number of pontoons, but they seemed to be a long distance across, extending over toward the Puget Island side; that "she appeared as though she was dredging or anchored. It was slack water. The pontoons were right across the channel." "She

was on the starboard side of the channel, headed across toward the Ore-
gon side;" that she seemed to be about two points to the starboard of
the Manzanita. Witness then relates that he examined the dredge with
a glass, and could see no running lights; that when about a mile
and a half below Waterford light, he slowed down and stopped—
meaning the engines; that he then starboarded his helm about two
points and sounded two whistles, with a view to notifying the dredge
that he was going to pass, so it could strike its lines down, as he
thought it was either at anchor or dredging; that it was impossible to
see the tug's lights, as she was on the starboard side of the dredge,
and the dredge was crossing the channel; that at that time the Man-
zanita was going down towards the dredge's port side; that he re-
ceived no answer to his two whistles; that he then gave his boat a
turn ahead on the same course—the dredge being pretty well on his
starboard bow still—and immediately stopped her, and then went on
his course, still assuming that the dredge was at anchor or dredging
until it was too late; that after they struck he saw the McCraken's
sidelights; that the Manzanita sank, headed a little south of the West-
port light, the depth of water on her inshore side being 29 feet, and
that he was about a quarter of a mile from the dredge when he stopped
the boat the last time. Witness estimates that the Manzanita was run-
ning 9 or 10 knots an hour before she was put under a slow bell, after
which she ran probably three knots. On cross-examination the wit-
ness testifies as follows:

"Q. Your course from Waterford to Westport is what? A. About west,
southwest by west. Q. That is compass course? A. Yes, sir. Q. You keep
the light ahead of you? A. We seen the light, sir. Q. Well, you run by the
compass? A. We run from light to light. I was heading for the light from
Waterford to Westport. Q. Continuously, were you? A. Yes, sir. * * *
Q. And ran straight for the light up to and beyond the time when you first
sighted the Columbia; is that right? A. I ran on that course till I stopped,
sir. Q. Until you stopped? A. Yes; and then I changed the course. * * *
Q. And where with reference to the Westport light? Was she nearer you than
the Westport light, or was she beyond the Westport light? A. She was above
Westport light. * * * Q. On your starboard bow? A. Yes, sir. Q. Dead
on, on your starboard bow, or was she a point or more off? A. About two
points, as near as I can remember. Q. About two points on your starboard
bow? A. Yes, sir. Q. That is, she was nearer, according to your testimony,
to the Washington shore than your course for the Westport light; is that
right? A. I was heading for Westport light, and she was on my starboard
bow about two points toward the Puget Island side, toward the Washington
side. Q. Toward the Washington shore, and away from Westport light, as
you say you saw it? A. Westport light was to the left of her. Q. As you
looked towards her? A. As I looked towards her, yes. Q. And what distance
off was it, Captain, that you saw her? A. Oh, she was probably, when I first
saw her, she was probably about a mile and a half. I can't tell to the dis-
tance. * * * She was towing across; she was trying to cross the channel.
* * * Q. Now, what distance were you when you slowed down, Captain?
A. From where, sir? Q. From the dredge? A. Oh, less than half a mile.
Q. Then, how long after you slowed down was it that you stopped? A. Right
away, immediately; about two seconds. Q. And how long did you remain
stopped? A. I have forgotten the time, sir. Q. You were still running on the
course you say you were on? A. No; I had starboarded two points after the
first stop. Q. I mean you were on your course till after you had stopped your
engines, were you not? A. Yes, for Westport. Q. Headed for the light, were
you? A. Yes, sir. And after I stopped her, I starboarded two points. Q.

When was that that you starboarded two points? A. After I stopped her. Q. When with reference to the collision happening? A. I can't tell you the time, sir. * * * Q. When did you blow two whistles? A. I was less than half a mile from her. Q. Was that before or after the time, Captain, that you starboarded your helm, that you blew the two whistles? A. Right away after I starboarded the helm."

Further on he says, "The dredge was on the starboard side of the channel. She wasn't taking up the Oregon side at all; she was on the Washington side." And, again, he says, "I didn't know she was in motion. If I had known she was in motion, it wouldn't have happened." "She struck us about right angles. * * * Pretty near broadside." The tide had "just turned flood." With reference to the distance the Manzanita was away from the dredge when she changed her course, the witness is at variance with his testimony previously taken, before Mr. Sholes, wherein he states that the Manzanita altered her course probably half a minute before she struck; probably a ship's length off from the dredge; that he thought there was going to be a collision, and he starboarded his helm to prevent it—this was when his boat was about a ship's length away from the dredge—and that he did not think the dredge was under way until after they struck. But on his second examination he asserts that he was mistaken in his statement on the previous occasion.

Michael Nolan, who was second officer on the Manzanita, corroborates Capt. Byrne in the main. He was officer of the watch at the time, and on the bridge with the captain. He relates that almost immediately after passing Waterford light, the Manzanita's course was directed for Westport reach light; that he "observed the dredge Columbia well on the starboard bow of the Manzanita * * * about two points"; that it was his "opinion that the dredge Columbia was either anchored or at work in dredging"; that he noticed the pontoons were in a position to indicate that the dredge was at work; that they were stretched out from the dredge to the Washington side of the channel; that the Manzanita continued on the same course until within about a quarter of a mile from the dredge, when the ship was stopped and two whistles blown, to indicate to the dredge that the Manzanita would pass to the starboard of her, to which there was no reply; that witness took a pair of glasses and looked for the lights on the dredge, and that he could find none except the lights in the living rooms and those on the dredge for the safety of the crew; that "there was no indication at all to know that she was under way or steaming." "There was nothing in the background of the dredge Columbia that could be seen from the Manzanita's bridge that would indicate that she was under way. At the time it was dark—the sky was clear—and there was no lights at the back of the dredge Columbia to indicate that she was under way. There was no running lights up whatsoever. * * * There was no lights at the back of the dredge Columbia whatsoever; but right directly ahead of the dredge Columbia Westport reach light was very plainly seen from the Manzanita;" that after the two whistles were blown and the engines stopped, a man was called to the lead and two soundings were made, showing 30 feet of water; that when the Manzanita sank she was headed about the same course as she was before—"right

for Westport reach light, right directly down the stream"; that after the collision witness, having a small boat, rowed from the starboard side of the dredge directly around the pontoons, coming back upon the port side; that he found the first four or five of the pontoons bunched up together on the starboard quarter of the Columbia, but that the remaining pontoons were stretched out towards the Puget Island shore, on the north side of the river. On cross-examination witness further testifies that he saw the lights of the Columbia almost immediately after passing Waterford light. about two points on the starboard bow, and that his ship was heading about for Westport reach light; that he first saw the Westport reach light about the time the Manzanita was stopped. and that he did not look for the light before; that the Manzanita was about a quarter of a mile from the dredge when she stopped her engines; that witness then saw the Westport light, and that the dredge Columbia lay to the north of Westport reach light, closer to the Washington shore; that he saw the lights on the fish traps, and that they were on the Manzanita's port bow about four points, approximately; that the second course of the vessel was not altered again until the collision occurred, and that the two vessels came together almost at right angles; that witness thought there was going to be a collision when the Manzanita was about a ship's length from the Columbia, at which time the dredge was about 7½ points on the Manzanita's bow; that nothing was done to change the Manzanita's course; and when asked whether he did not know that the dredge was under way, the witness answered:

"No, sir; I did not. How could I know it? There was two whistles blown by the Manzanita; the dredge Columbia made no reply; there was no running lights visible from the dredge Columbia; and it was impossible for me to understand that the McCraken was towing the dredge Columbia, or that the dredge Columbia was under way."

Henry E. Wilson, the engineer on the Manzanita, testifies that the Manzanita was struck just abaft the collision bulkhead; that the engines were stopped about five minutes before the collision; that he got a signal to stop, and responded to it; that two whistles were sounded; that he got another signal to go ahead; and when the engines had made two or three revolutions, he received another signal to stop, and the engines were controlled accordingly.

These witnesses are testifying from the view point of the Manzanita approaching the dredge. The following were looking from the dredge and tug:

Eugene H. Hayden, master of the tug McCraken, testifies that on the 6th of October the dredge was at work about 200 feet south of the southerly shore of Puget Island; that they finished the work there in the forenoon, and made preparation for moving up the river to Doublebower; that they made the start between half past 3 and 4 o'clock in the afternoon. and that their rate of navigation was between a mile and an eighth and a mile and a quarter per hour; that they probably did not average a mile when they started; that the tide had not begun to turn then, and as the tide kept slackening, they made better time; that the tide was ebbing when they started, and was still

ebbing when the collision occurred; that witness was himself a look-out, and had a mate for the same service; that just as it began to get dusk witness left the pilot house of the tug and went to supper; that as he came out from supper he saw a steamer approaching; that he could see her red light away over on the Cape Horn side, over by Waterford, witness being at the time upon the dredge, on the port side; that witness took her to be a tug; she had a mast light; that he used no glasses; that it was about 10 minutes prior to the collision; that he did not again see the steamer until she drifted across their bow and the vessels came together, and that there were two or three men supposed to be on the lookout—the witness then being in the pilot house of the tug, at the helm; that he followed the Oregon shore all the way from the time he reached the Westport reach light, hugged that shore, keeping in as close as he dared, between 200 and 300 feet away; that he swung out by the lights to clear the fish traps; and that the collision occurred about 6:30 or 6:35. When asked why he did not comply with rule 6 of the pilot rules, witness answered that he did not hear any whistle to pass; that he thought the Manzanita was another tug coming down, which they were expecting to meet them and to help them up the river; that at the time he first saw the Manzanita she had not then made the turn at the Waterford post light. Witness further testifies that he reached the Oregon shore probably 500 or 600, maybe 1,000 feet below Westport light, and that he was heading right straight up with the current; that he was 200 or 300 feet from the fish traps when the collision occurred, and that the pontoons were trailing straight behind the dredge; that the Manzanita sank in about the same position that she was in when struck; that it is witness' belief that she did not move after she was hit; that the dredge swung clear and dropped below her, and that one of the spuds of the dredge was then dropped; that the Manzanita crossed nearly at right angles to his course; that she was headed directly in to the Oregon shore, with her bow on; and that the tug's engines were stopped just as soon as the Manzanita loomed up across her bow.

Charles F. Smith, inspector for the government on the dredge Columbia at the time, testifies that the dredge started from Coffee Island about four in the afternoon; that they crossed over to the Oregon side, and kept up as close to the shore as possible; that witness saw the Manzanita about a quarter of a mile off; that he had just come out of the dining room, and was standing on the port side of the dredge; that the Manzanita was lit up—he did not notice the side lights; that she seemed to be coming directly toward the dredge— that is, at an angle toward the dredge; that he watched her as she approached until she struck about four or five minutes afterwards; that the lights did not seem to change until they got within two or three boat lengths of the dredge; that the Manzanita swerved around and came directly across the dredge's course; that the pontoons were trailing on behind the dredge; that when the Manzanita struck she stayed on the cutter about a minute, when she slid off and sank; that she went down where she was struck, and that the current was about slack; that when the Manzanita struck, she was heading right into the fish traps; that she was between 100 and 200 feet out from the

traps; that when she came in contact with the dredge she was going in the same direction as the prolongation of the fish traps. The witness here indicates the course of the Manzanita on the plat, which shows it to have been approaching the traps at an angle of about two points to her port. On cross-examination, the witness relates that from the time the dredge approached the Oregon shore, there were fish traps along at intervals up as far as the traps where the collision took place; that there were some four or five along in that neighborhood; and that the dredge kept out from the fish traps as much as 100 feet, which would carry its course out in the channel some 400 or 500 or 600 feet, perhaps 700 feet.

Nels Halvorson testifies that he was the carpenter on the dredge Columbia; that at the time of the collision the dredge "was working over toward the Oregon shore"; that he first saw the lights of the vessel, which afterwards turned out to be the Manzanita, when he came out from the supper table; that he "noticed the light and heard her two whistles blown;" that he was standing at the time "just about amidship of the dredge, on the port side;" that the lights bore as nearly direct toward the witness as could be; that they were about four or five ship's lengths off—that is, 600 or 700 or 800 feet away; that he could just see the outline of the hull of the approaching vessel; that he could see the pontoons of the dredge at the time, and that they were trailing a little bit to the dredge's port side, but not much, just enough so that witness could see all the lights displayed; that after witness saw the lights, he called the attention of the mate of the steamer McCraken to them, then went over to his room, stepped inside, got his hat, and came out again on the deck; that he then saw the steamer changing its course to pass the dredge; that she was then about 300 feet off—he could not tell exactly; that when he saw the maneuver he expected a collision, and went forward to look at it; that the vessels came together at an angle "pretty close to 45 degrees;" that the Manzanita sank a few feet from the cutter's frame, and that the dredge stopped, so far as he knew.

Frank Doherty, watchman on the dredge Columbia, testifies that when he first saw the Manzanita he was on the port side of the pilot house of the dredge; that he had just come out from supper a few minutes before; that he saw both of the lights, and that the boat seemed to be approaching him directly; that the lights looked as if they were coming in on the port side of the dredge about midship or a little forward; that he did not hear any whistles; that some time after he first saw the lights the boat seemed to change her course to port, enough so that it brought her diagonally across the dredge's bow, and that he was not sure as to the distance off when the boat changed her course; that at the time the dredge was over "coming up on the Oregon shore side," and that the boats came together diagonally.

From this abbreviated review of the salient features of the testimony, it at once becomes manifest that an irreconcilable conflict obtains; nor is it possible to adopt the testimony of either the one side or the other as accurately and faithfully portraying the facts, conditions, and environment. It, therefore, becomes necessary to proceed

from the things that are conceded or appear to be really established, and to judge of the others necessary to a decision of the controversy according as the inherent probabilities influence the understanding. The City of Cleveland (D. C.) 56 Fed. 729.

The point of collision is situate from 200 to 300 feet instream. from the outer end of two fish traps noted upon the plat subjoined to the foregoing statement. These traps are located on the government's map, presumably accurately; yet it has not been made clear that the government has definitely or precisely located them, and it may be that they in reality stand, by a distance somewhat material to the controversy, above or below the position as indicated upon the map. The positions of the two lights—Waterford and Westport—are perhaps faithfully indicated. The fish traps extend into the stream 500 or 600 feet, thus fixing the point of the collision from 700 to 900 feet from the Oregon shore. The consensus of the evidence is to the effect that its locality is some 800 or 900 feet from the shore, and between 200 and 300 feet from the outer end of the traps, being nearly midway between the traps if extended. By laying a rule upon the map, which is drafted on a scale of 1 foot to 40,000 feet, it will be found that the place of the collision is 2.15 miles below the Waterford light. From the point where the tug and dredge began their navigation upstream to the point of collision is 3.75 miles, and Westport light is located about a mile and a quarter plus 300 feet below the place of collision. The course downstream that the pilots and ship navigators have adopted, after shutting in the Waterford light by the stern and heading for Westport light, passes to the northward of the point of collision from 900 to 1,000 feet; the former distance being probably more nearly exact. The distance of the wreck from this course is but slightly greater than from a course extended from a point 350 feet abreast of Waterford light direct to Westport. It would probably not be far from 100 feet. It will be remembered that this latter course is the one that Capt. Byrne, the master of the Manzanita, claims to have followed until he veered to port at about the time of signaling the Columbia. The average rate of speed of the Columbia, allowing that she left Coffee Island at 4 p. m. and brought up at the collision at 6:45—which data as to time is as nearly correct as can be ascertained —was 120 feet per minute. She increased her speed, owing to the slackening of the tide current as she pursued her voyage, and was probably making more than 1½ miles per hour, or 132 feet per minute, at the time of the collision. If the Manzanita made 9 or 10 knots an hour up to within a quarter of a mile of the point of the collision and 3 knots thereafter, the time consumed would have been about 17 minutes from the time she was abreast of Waterford light. If she made 9 or 10 knots until within one-half mile of the place of collision and 3 knots thereafter, about 20 minutes' time would have been consumed. Now, within 17 minutes, the Columbia, at the rate of 1½ miles per hour would cover the space of 2,244 feet, or 2,640 feet in the space of 20 minutes. If the Columbia pursued the course as delineated by Capt. Hayden, who was in charge of the tug McCraken, she must have crossed the course which Capt. Byrne says he followed, before Hayden first saw the Columbia from nearly abreast of Waterford

light, and possibly the entire line of pontoons would have gone by, so that Westport reach light would have shown clear astern of the tug and her entire tow. If the Columbia was pursuing the course which Capt. Byrne and second mate Nolan say she did, she in all probability had not, when first sighted, crossed or begun to cross the Manzanita's course, but she could not have been far from an intersection with such course. That Capt. Byrne and Nolan are clearly in error as to the position of the Columbia on the Manzanita's starboard is demonstrated beyond peradventure. They give her position when first sighted as two points on the Manzanita's starboard, which would carry the Columbia over to within 1,000 feet of the Cathlamet channel—a point being 11 degrees 15 minutes. Seven degrees would carry her to the north bank of the river, so that the Columbia could not have been more than two or three degrees at the uttermost to the starboard of the Manzanita at the time when sighted by the latter's officers, if the former had not then intersected the latter's course. Nor do I think the testimony of Capt. Hayden and Inspector Smith is any more reliable as to the course the Columbia pursued upon her voyage. Capt. Hayden testifies in effect that his course carried him to a point 400 or 600 to 1,000 feet below Westport light; that he ran within 200 or 300 feet of the Oregon shore, and swung out according as the fish traps were in his way. Mr. Smith says that the dredge approached the Oregon shore approximately 1⅜ miles below Waterford light; then that the course was outside of the range of the fish traps, of which there were several, and was within perhaps 700 feet of the Oregon shore. Smith was in his room, which was on the dredge, a portion of the time, and a part of that time the lights on the dredge were burning. Some of his estimates as to distance pursued from the Oregon shore were made with relation to the time while occupying such room, and are certainly unreliable. To my mind, it is highly improbable that the Columbia ever advanced beyond the center of the water channel of the river prior to intersecting the ship's course between Waterford and Westport lights. I have two principal reasons for this statement, which are strengthened by the testimony of Nels Halvorson, the carpenter upon the dredge Columbia: First, the tug McCraken furnished but meager motive power for towing the Columbia upstream. It was expected before moving that another tug would come to the assistance of the McCraken, but, for reasons not appearing, an order was sooner given for entering upon the voyage. The cutter on the Columbia was lowered, and the pumps set to work for the express purpose of aiding the McCraken in her navigation of the Columbia by drawing water through the dredge pipe and discharging it aft, so that every expedient was resorted to in aid of the tug in conveying the tow upon her journey. Second, the current of the river, the tide being at ebb until nearly the time of the collision, was directly upon the course which Smith says the dredge pursued, and the course delineated by Captain Hayden carried the navigating crafts directly into the current somewhat below Westport light, and thence absolutely within such current on until the time of the collision. Hayden says, in effect, that he was trying to get into the current, as it was not of much force anyhow, the tide being nearly flood. But

Smith says the crafts were trying to avoid it. As a matter of fact, the tide had just turned to flood at the time of the collision, and there must have been a strong ebb tide at 4 o'clock. The most natural thing under the conditions prevailing, and the essential thing for the tug McCraken if she was going to make any progress at all, was to avoid the ebb current. The crafts were well to the north of the current when they started, and it would have been sheer folly to attempt to cross it at the outset, much more to stem the ebbing tide the entire distance they had gone at the time of the collision. It was a thing, by the strongest induction, the navigators did not do. Hayden and Smith might have candidly thought that the Columbia ran much nearer to the Oregon shore than she really did. They were voyaging without compass—that is, without definite course—and in the nighttime principally, their paramount purpose being to make as much speed as possible, and for that very reason they were within the bounds of all probability avoiding the one thing that would impede their progress more than all others—the current of the river that was going out with the tide. The most natural and reasonable thing to do was to cross this current when the tide was just at flood, the exact condition that obtained as described by two or three of the witnesses when the collision occurred. There is a reason also for crossing the current near the place of the accident, as it there courses nearly the center of the stream, and farther up veers to within proximity to the northern bank, so that the slack water above the place of collision was to be found near the southern shore. Mr. Halvorson, when asked, "Do you know on what side of the river the McCraken and Columbia were proceeding at the time of the collision, and say for an hour before the collision?" answered, "Well, she was working over toward the Oregon shore." Couple this with his further statement that he stood on the port side of the dredge, and looking aft saw all the pontoons and the lights displayed thereon, and it shows that the dredge was changing its course at the time to port. Two interpretations can be made of the expression "She was working over toward the Oregon shore"; one that she was pursuing a course over near the Oregon shore, and the other that she was crossing to that side. The witness was manifestly guarded in his statement, considering both the question and his answer, and evidently intended to indicate that these crafts were then navigating toward the Oregon shore. This would probably put the Columbia across the ship's regular course within less than a half mile, or 2,640 feet, of the place of collision. I am impressed that the tug and tow did so actually cross the ship's course within less than that distance from the place of collision. Their course prior to that time cannot materially affect the situation. This probable converging course of the tug and tow with the ship's course finds support in the positive statement of Capt. Byrne and his second mate, to the effect that the Columbia had the appearance of being at anchor or at work, with the pontoons extending over toward the Puget Island or the Washington shore.

Turning now to the Manzanita, her course is not susceptible of clear definition or explanation. It is probable that the officers of the Manzanita sighted the Westport reach light across the bow of the Colum-

bia when she was first seen; but if the Manzanita kept on her course—
that is, headed directly for Westport light—it must soon have become
apparent that the Columbia was crossing that course, which would
shut out Westport light. It cannot be, therefore, that the Manzanita
followed a direct course from abreast Waterford to Westport light. I
think it more probable that the Columbia, when sighted, was nearly in
range with the Westport light, and believing, as the ship's captain and
the mate say, that the dredge was at rest, the Manzanita was headed
for the Columbia, and continued in that way, changing her course im-
perceptibly as the Columbia moved across her regular course, not tak-
ing particular note of other lights until the effort was made to go by
the dredge. This view finds substantiation from three of the witnesses
for respondent, including Smith, the government's inspector. They all
concur in saying that the Manzanita approached the dredge directly,
both running lights of the Manzanita being in full view from the time
they first observed her presence until she changed her course. These
witnesses vary in their estimates as to the distance the ship was away
when first sighted from a quarter of a mile to two or three ship's
lengths. The officers of the Manzanita say that her course was chang-
ed but once after heading for Westport light, which was from a quar-
ter to less than a half mile from the dredge, so that here is evidence
pertinent and strong that the Manzanita's course was headed for the
dredge, and not for Westport light, as the master and second mate
assert. It may have occurred that, at the time when the dredge was
first sighted by the Manzanita, the former was even then crossing the
line of the ship's course, and the master of the Manzanita mistook a
light upon one of the fish traps for the Westport reach light, and
directed the course of the Manzanita accordingly. It will be recalled
that Nolan does not say that he remembers seeing the Westport light
until about the time the Manzanita signaled the dredge, and it was
then he saw that light clear in front of or across the bow of the dredge.
This could only be so on the hypothesis that the Manzanita was off
the ship's course, because it is a thing absolute that at that time the
dredge had crossed the ship's course between the two lights, and also
the course which Capt. Byrne insists that he followed. If Byrne did
mistake a light upon one of the fish traps for the Westport light, and
was heading therefor, even that course must have been intercepted at
about the time the Manzanita's engines were stopped and her whistle
blown, because, when seen from the dredge, she was then heading
direct for the dredge, and a change in the course of the Manzanita
was made to starboard, with a view to passing starboard to starboard
with the dredge. It is a thing within the larger probability to my mind,
however, that the dredge at the time when first sighted was about to
intersect, or was even then intersecting, the regular ship's course, thus
putting her lights almost, if not quite, in line with the Westport reach
light, and that Captain Byrne, believing the dredge to be at anchor or
at work, set his course for the dredge, and that, as the dredge slowly
pursued her course across the ship's channel, the Manzanita's course
was kept head on towards the Columbia's lights. The helmsman of
the Manzanita was not here to testify. If he had been, more light
might have been shed upon this immediate situation.

Most of the witnesses who say anything upon the subject testify that the vessels collided nearly at right angles with one another, but Halvorson, who watched the ship's approach from the port bow of the dredge, says they came together at an angle of about 45 degrees, and Frank Doherty says they came together diagonally. Smith's testimony would indicate that the Manzanita was moving almost straight across the channel of the river at the time, while the dredge was navigating nearly with the course of the stream. It seems impossible that such could be the case, when it is considered 'that the Manzanita sank nearly with the current, heading downstream, with the Westport light somewhat to her starboard. Her position in the water demonstrates the position in which she sank. The consensus of the witnesses seems to be also, that she sank nearly in the position in which she was found at the instant of collision. If this is so, Smith's idea as to the course of the Manzanita cannot be correct. If the Manzanita became fast to the cutter by the impact, it is natural that she should swing around to some extent, owing to her speed being greater than that of the dredge, but it could hardly have been so much as nearly the fourth part of the circle, or anywhere near that. It is narrated that the Manzanita hung upon the cutter about a minute; then slid off; and that it was after the contact was severed that the dredge swung around downstream until the spud was dropped, which operated to allow her to right herself again. A right-angled contact can only be accounted for on the theory that the dredge was making her way diagonally across the stream at the time, and that the veer of the Manzanita to port threw the boats in somewhat that relation, and the swing forced by the impact caused the Manzanita to sink with her head downstream. And yet it seems impossible then that she could have swung around sufficiently to put her in the position in which she sank. I am unable to believe that the angle of contact was nearly so great as at right angles. It could scarcely have been greater than 45 degrees; possibly somewhat in excess thereof. Such an angle of convergence corresponds with the position of the dredge two points to the starboard of the Manzanita, on the hypothesis that the course of the dredge was angling across the stream, and the course of the Manzanita just prior to the change of two points to port was head on towards the dredge, or rather her starboard quarter, as would seem to be the case from the testimony of Halvorson; and this hypothesis, supplemented with the change in the Manzanita's course, I am constrained to believe defines the true course in which the Manzanita was moving at the time of the collision.

Now, having determined the probable movements of the two crafts shortly before and up to the time of their contact, I will endeavor to determine, if possible, the responsibility for the casualty. The tug and tow were at the time of the collision crafts navigating in the night-time. It was a duty imposed by the rules of admiralty that they should have been provided with running lights; that is to say, the colored starboard and port lights. The Eugene F. Moran (D. C.) 143 Fed. 187. The tug was so lighted, the tow not; but by reason of the greater height of the tow, the running lights of the former were obscured from all craft approaching from the Columbia's starboard, and there-

fore the condition was the same as if the navigating crafts had no running lights at all, so far as it affects the present controversy. This was a fault. Further, it is not shown that there was any lookout upon the Columbia while so navigating. Some of the witnesses speak of a lookout in connection with the running of the vessels, but none is shown to have been stationed upon the tow, or remained thereon during the time, and certainly no one has testified as to discovering the approaching vessel while at his post of duty. All the witnesses who at first noticed the Manzanita were casual persons about the Columbia, except Capt. Hayden, who really saw her port light up by the Waterford light; but he paid no further attention to her, nor saw her again until she crossed the bow of the Columbia. This was another fault of the tug and tow, in not keeping a lookout on the tow while under navigation.

Another fault is manifest in the fact that the Columbia was navigating by night, with her cutter lowered and under water, extending 30 feet beyond the bow. It is further shown that the tug sounded no whistle in answer to the signal from the Manzanita. Capt. Hayden says he did not hear the signal, but others on the Columbia did. If, hearing the signal, Capt. Hayden failed to respond, being then under way with his crafts, this was another fault. So that, at the outset, the tug and tow were at fault sufficient to fix entire responsibility for the collision, unless it be that the Manzanita was so grossly negligent as to conduce primarily to the casualty of which she complains, or was also at fault contributing to the accident.

The contention of the respondent is that "The Manzanita was not running upon the course prescribed by law, and was, moreover, so improperly, recklessly, and imprudently navigated as to bring about the collision in question." Article 25 of the pilot rules (Act June 7, 1897, c. 5, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]) is invoked. It reads:

"In narrow channels every steam-vessel shall, when it is safe and practicable, keep to that side of the fair-way or mid-channel which lies on the starboard side of such vessel."

I have no doubt the rule is applicable on the Columbia river in the vicinity of the collision, as it must there be considered to be a narrow stream. The Sydney; The William Worden (C. C.) 47 Fed. 260; The Acilia; The Crathorne (D. C.) 108 Fed. 975. The probable exigencies of the situation were, however, that when first sighted by the Manzanita, the tug and tow presented the appearance of being at anchor, with the pontoons extending toward Puget Island or the Washington shore, which closed up for navigation purposes the fairway to the north of the dredge. The course of the Manzanita was thenceforth dead on for the dredge, or for some light other than the Westport reach light, because as I have shown by a reference to the testimony of witnesses upon the dredge, she was heading, with both her running lights in view, shortly before the collision, for the dredge, and both the dredge and Manzanita were at that time entirely south of the regular ship's course some hundreds of feet. Even up to shortly before the collision, the dredge and its pontoons must have presented the ap-

pearance to the Manzanita of extending diagonally outward into the channel, so that it would seem to the navigators upon the Manzanita more expedient to pass to starboard than to attempt to pass around the long line of the pontoons aft. It is shown that there was ample fairway between the traps and the dredge for the Manzanita to have passed in safety to the starboard. Believing, as the Manzanita's officers say, that the dredge was at anchor, the Manzanita sounded two whistles, meaning thereby that she was going to starboard. The signal should have been promptly answered by the tug, but it was not, so that the tug still left the Manzanita in doubt as to whether she was a navigating craft, or anchored, and pursued her course unmindful of the Manzanita. The strong inference is that the signal of the Manzanita was heard by the tug, but, believing that the approaching vessel was another tug coming to the assistance of the McCraken, no attention was paid to it. This was a grievous fault on the part of Capt. Hayden. He saw the Manzanita abreast of Waterford light. He should have watched the vessel until she passed in safety, or had some one on the lookout to determine her course and identity until the fairway was clear of her presence.

Another excuse put forth by Capt. Hayden is that he supposed he was entirely south of the ship's course, and that it was not incumbent upon him to pay any attention to other navigating craft. However this may be, his course had been, and was then, by the greater probability angling across the channel, and it did not behoove him to disregard in any measure the rules of navigation while in the ship's channel. I am impressed that, had the tug answered the signal of the Manzanita so as to indicate that she was a navigating craft, or changed her course even slightly to port, there would have been no collision. Or had she, by the appropriate signal, declined the signal of the Manzanita to pass to starboard, the Manzanita might have prevented the collision by stopping and backing, if need be.

It must be considered that the Manzanita was not a deep seagoing craft, and it was not essential that she navigate upon the regular ship's course. It is explained by Nolan, the second mate, that, "as a matter of fact, the lighthouse tenders are seldom steered on a course." I think it was a fault, however, in the Manzanita that she did not steer on a course. If she had, she would have discovered that the Columbia was navigating, because she must have become aware, if holding direct for Westport light, that the Columbia was crossing her path, and thus she could have passed by the Columbia's stern and avoided the collision. Instead of doing this, she, in all probability, as I have before observed, approached the Columbia as a craft at anchor, intending to go by with reasonable facility when within proper range, being deceived by the fact that the Columbia was moving instead of being at rest.

Considerable testimony was offered with a view to establishing the existence of a custom with pilots and navigators as to signaling the dredge when at work. The witnesses are not in entire harmony relative to the subject, yet it may be said that such a custom prevailed. Groves describes the signal as one prolonged blast. Then, he says, if the

dredge does not answer, another blast is sounded. If, however, the dredge is under control so that it can haul out of the channel, it answers by a long whistle, which indicates that the way is clear. Willis testifies that coasters and big vessels blow one long whistle; that some of the river boats blow a blast, and some do not; that, as soon as the way is clear, the dredge answers with a whistle; that sometimes boats get lost, and blow two blasts or sometimes one, not knowing on which side to go, and then that the dredge would "blow them on the regular side." Capt. Pease says that it had always been his custom to blow one long whistle; that if the dredge did not then get out of the way he slowed down, and that if the dredge could not get out of the way she would blow some short whistles, which would cause him (the witness) to stop his vessel.

It will be seen from these brief references to the testimony, touching the custom as to signaling the dredge while at work or at rest, that the approaching vessel even then expects a reply from the dredge, and especially so if the dredge is out of the way so that there is channel way for the vessel to go by. But the dredge in the present instance, although it was navigating at the time, omitted to signal at all, and otherwise paid no attention to the Manzanita's approach. On the other hand, a more attentive observation on the part of the Manzanita, as previously observed, should have put her in possession of the knowledge that the tug and tow were moving craft, although their running lights were obscured. Being in possession of that knowledge, it would have been an easy matter to avoid collision. Being a craft, however, that was not required to pursue the regular ship's course, she was at greater liberty to direct her course anywhere in the channel affording ample depth of water for safe navigation, though she was bound to observe the rules of the roadstead in meeting and passing other craft, the same as they. I attribute, however, the primary cause of the collision to the faulty action of the tug and tow.

It is argued that the Manzanita did not soon enough change her course. I think, myself, that she did not. But from the standpoint of her navigators, she changed in time to avoid the dredge if the latter had been a stationary thing in the channel; but being a moving object, and continuing on her way without giving any signal by which to indicate her action, or issuing any note of warning whatever, hers became and was the proximate contributing cause of the accident.

The further question then arises as to whether there should not be a contribution of damages as between the dredge and the Manzanita. It was determined in the case of The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 216, 37 L. Ed. 84, that:

"Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor."

Following this is the case of The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053, where it is, in effect, held that, where the fault of the offending vessel is gross, any doubts respecting the management of

161 F.—14

the opposing vessel or the contribution of her faults, if any, to the collision should be resolved in her favor. See, also, The Victory and The Plymothian, 168 U. S. 410, 423, 18 Sup. Ct. 149, 155, 42 L. Ed. 519, where the court says:

"As between these vessels, the fault of the Victory being obvious and inexcusable, the evidence to establish fault on the part of the Plymothian must be clear and convincing in order to make a case for apportionment. The burden of proof is upon each vessel to establish fault on the part of the other."

To the same purpose are The Ludvig Holberg, 157 U. S. 60, 15 Sup. Ct. 477, 39 L. Ed. 620, and The Genevieve (D. C.) 96 Fed. 859.

It is manifest that the fault of the tug and tow in attempting to navigate the river in the nighttime, without running lights and without constant lookouts upon the tow, with the cutter of the tow extending 30 feet in front of her, lowered beneath the surface of the water, and in utterly failing to recognize or reply in some way to the signal of the Manzanita so as to apprise her of their action and intentions, was very gross; and, the burden being imposed upon the respondent to show that the Manzanita was also a contributing factor to the casualty in order to an apportionment of damages, it is required to make out such a state of the case by clear and convincing proof. I cannot say that the respondent has done this, and therefore I conclude that it should be required to bear the entire burden of damages arising from the collision.

Having found the respondent liable, I tax the damages against it in the sum of $12,670.90, in accordance with an itemized statement thereof, which I now file with the record in this cause.

The claim of $2,000 for repairing the rent in the Manzanita's hull, I allow to the extent of $1,327 only, adopting the testimony of I. N. Day as showing the reasonable cost thereof. The claim of $2,000 for labor in cleaning, overhauling, and repairing wreck, I allow to the amount of $1,653.60. I arrive at this estimate upon the testimony of Wilson, the engineer, who says that eight men were employed three months in cleaning and repairing the engine and the engine room and wreck. Three of these men received compensation of $10 per month, three $50 per month, one assistant engineer $3 per day, and the engineer himself $4 per day. And I allow for findings for the six men 20 cents each per day, and for the officers $1 each per day. It seems to me that this fully covers the reasonable cost of such cleaning, overhauling, and repairing. I allow the item of $1,635.55 for loss of clothing and personal effects of the seamen. I do this upon the authority of The Minnie (D. C.) 26 Fed. 860, and Leonard et al. v. Whitwill (D. C.) 19 Fed. 547. It is the policy and practice of the government to make appropriations to cover allowances for loss of personal effects through a wreck not occasioned by the officers or men themselves. In this very case it seems, from the testimony, that a bill was introduced covering the amount of the claim made by these men, with a view to reimbursing them for their loss. The government does this in justice to the men, they being in its employ. There is question whether I should allow the full amount of this claim, but the only objection made to the item was that no part of it is a proper item of damages

against the respondent; no question being made as to the amount. Of course, the men are getting new clothing and effects, whereas those lost must have been in some measure worn or deteriorated, but the amount of that deterioration is not shown anywhere in the testimony, and there is no basis upon which to determine the exact loss sustained. I therefore allow the whole item, without deduction for deterioration.

I disallow the items paid crew as per pay roll for the months of October, November, and December of 1905, and all items denoting amounts paid for subsistence of crew during the same months, as the government would have expended these sums notwithstanding the wreck of the Manzanita.

Libelant is entitled to interest upon the amount of damages found against the respondent at 6 per cent. per annum from the time of the wreck.