## THE CASCADES.

### (District Court, D. Oregon. April 18, 1910.)

### No. 4,923.

1. COLLISION (§ 102*)—STEAM VESSELS MEETING IN FOG—MUTUAL FAULTS.

A collision on the Columbia river at night in a fog between the steamer Cascades passing down from Portland and the steamer Lurline, passing up *held* due to the fault of both vessels; the Cascades being in fault for being entirely out of her course and on the wrong side of the river in violation of article 25 of the Inland Navigation Rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), requiring steam vessels in narrow channels to keep to that side of the fairway which lies on their starboard side, whereas she was heading across the river, and the collision occurred within 200 or 250 feet of the Oregon shore, and both vessels being in fault for running at full speed until nearly the time of collision, although each heard the fog signals of the other in violation of article 16 of such rules.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 102.*]

2. COLLISION (§ 82*)—RULES OF NAVIGATION—SPEED IN FOG—"MODERATE SPEED."

The moderate speed required of a vessel in a fog by article 16 of the Inland Navigation Rules (Act June 7, 1897, c. 4, 30 Stat. 99 [U. S. Comp. St. 1901, p. 2880]) is such speed as under existing conditions will enable her to stop before coming into collision with another vessel after the latter can be seen, assuming that the other vessel also observes the rule.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 170–174; Dec. Dig. § 82.*

For other definitions, see Words and Phrases, vol. 5, pp. 4551, 4552.

Navigation rules, speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.]

In Admiralty. Suit by the Vancouver Transportation Company against the steamboat Cascades, and cross-libel against libelant as owner of the steamboat Lurline. Decree dividing damages.

Dolph, Mallory, Simon & Gearin and W. W. Cotton, for libelant.
Thomas N. Strong, for respondent.

WOLVERTON, District Judge. This libel is instituted to recover damages for injuries sustained by the steamboat Lurline, alleged to have been caused by the steamboat Cascades negligently coming into collision with her. The collision occurred on the morning of November 22, 1906, at about 3:54 o'clock. The Cascades by cross-bill claims damages also against the libelant, averring that the cause of the colli-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

sion was negligence in the navigation of the Lurline. The Lurline was on her night run from Astoria to Portland. She usually stopped at Rainier to take on passengers, but did not always do so. However, her practice was to run in near enough to that point so that, if persons desired to board the boat, they could call to her, and, upon their doing so, she would land. Capt. Olney was in charge as pilot at the time, and he testifies that, when he reached Cowlitz boom light, which is below Rainier in time about five or six minutes, a light haze was on the water, but not sufficient to make it necessary to sound the fog signals: that at that point the Lurline was put on her course for Rainier, and proceeded to within about 200 feet of the dock, and, not having been hailed from shore, proceeded on upstream, running parallel with the shore; that at the lower end of Blanchard's dock she was put on her regular course, E. ½ S., past Smith's mill. It should be explained that Rainier is 850 feet below Blanchard's dock, and that Smith's mill is 1,400 feet above. Capt. Olney further states that he continued on that course up the river, parallel with the shore, and from 200 to 250 feet therefrom; that before coming to Rainier he heard a steamer above blowing fog signals; that he then began blowing like signals as he proceeded; that he saw the lights at Rainier as he passed, also at Blanchard's dock and Smith's mill, and from these he knew that he was running on the regular course passing these points; that after passing Blanchard's dock, he saw the masthead light of a steamer coming downstream, well outside of his boat; that he kept his course, and when nearly to the lower end of Smith's dock he saw the light again almost abreast of him, but paid no further attention to it, and watched his compass; that very shortly the lookout gave warning that a boat was running into the Lurline, and at that time he glanced around, and saw the boat still outside; that he at once stopped the engine of the Lurline, reversed it and backed, and when he had the headway well checked, the Cascades struck the Lurline near midship, broke through her guard, and pierced her hull to the distance of about six feet, causing the Lurline to sink. He further testifies that, after the collision, he attempted to beach the Lurline, and ran her bow either into a slab-wood bulkhead just below the dock at the sawmill, or into some piling driven there, and broke off the jack staff on his boat by doing so; that the water was so deep at the margin of the stream that the boat would not hold, and she drifted out again, and finally sank some 200 feet from shore, with her bow down stream, the reverse of the way she was running at the time she was struck. When Capt. Olney first saw the masthead light of the Cascades, he thinks she was about 700 feet away, and that this was about three minutes before the collision; that the course of the light was almost due east of the Lurline, or a little north of east, and that, as the Cascades came closer, it seemed to him as though she was further away from his course, and that her course would take her well out, some 600 or 700 feet distant. The Cascades struck the Lurline a little quartering of right angles, and Capt. Olney estimates that the Lurline was about 250 feet from shore at the time of the collision, and at that time had been running some two minutes parallel with the shore. He was running full speed ahead until the Cascades was sighted, being about 12 miles per hour. When the watchman reported

the approach of the Cascades, he saw both her colored lights, just before she struck, and at that time the Cascades was probably 300 or 400 feet distant. He further states that the colored lights could not be seen through the fog at the distance of 600 feet. Capt. Olney is corroborated in his statement by the witnesses Laws and Truitt. Laws was the watchman, and at the time was standing forward of the wheelhouse on the Lurline. He testifies that he saw the white light of the Cascades somewhere near on the port bow of the Lurline, and a little later he saw the red light, and just after that both colored lights, all of which he reported to the captain. The captain at once gave the stopping signal, reversed the engine, and backed the boat. When first seen, the Cascades' light was probably 400 or 500 feet off, on the port bow of the Lurline. Truitt, who was a deckhand, saw the Cascades a couple of lengths away. He says that he saw the red light first, but that both colored lights came into view very nearly together. Abbott and Saltus, deckhand and cabin watchman, respectively, were first warned of the approaching collision by the sounding of the gong for the stopping of the engine. All these witnesses seem to concur that the lights at Rainier, Blanchard's dock, and Smith's mill were visible as the Lurline passed up, and that the Lurline's course was perhaps from 200 to 250 feet off and parallel with the shore; that the lights could be dimly recognized through the haze and the fog, but that the fog was not very thick. These witnesses also concur that after the collision the Lurline attempted to run into shore, but that she was unsuccessful, and finally drifted out and sank some 200 feet from shore, with her bow downstream. Some half dozen fog signals given by the Cascades were heard by the Lurline prior to the collision; the Lurline beginning to blow her fog signals shortly after hearing the Cascades' signals.

On the other hand, it has been shown that the Cascades left Portland for points down the river shortly after midnight. The pilot on the Cascades testifies that he ran into a fog bank about half way between the Danby sawmill and Smith's mill; that he had been running in the fog a short time when he heard another boat; that he kept his course at his usual rate of speed, namely, about 12 miles an hour, until he had heard three or four signals from the approaching boat, when he stopped his engine, and thereupon allowed his boat to drift; that at the time he was very close to the shore, but upon his fog course going down stream, which he states took him close to the shore at that point. A little later, however, he says that his fog course was S. by W. ½, which would bring him off the shore from 600 to 800 feet. He further testifies that, after drifting some three or four minutes, he saw the red light of the Lurline across his starboard bow; that shortly previous thereto he noticed a very dim light on shore, which he supposed to be the light from Smith's sawmill, and he also saw the loom of the mill; that, upon seeing the red light of the Lurline, he immediately backed his engine, but before the Cascades could be stopped, she came into collision with the Lurline; that the Lurline at the time was heading across the bow of the Cascades. He affirms that the fog was very thick at the place of the collision. He was of the impression also that

he was running parallel with the shore at the time, and, further, that, when he saw the red light of the Lurline, he at the same time saw the light at Rainier across his starboard bow. P. Roeser, who was watchman on the Cascades, with position in front of the wheelhouse at the time, relates that some 15 or 20 minutes before reaching Rainier the Cascades ran into a thick fog; that he then heard fog signals, and reported the fact to the pilot; that the pilot subsequently stopped the engine and allowed the boat to drift, but that about two or three minutes later he saw the red light of the Lurline, and that at the time he could not see the shore, although he saw glimpses of light on the dock; that he reported seeing the light of the Lurline to the pilot, whereupon the pilot sounded the bells for reversing the engine, and in about a minute thereafter the collision occurred; that when he saw the red light the boats were about a boat's length apart; that the Lurline was headed across the bow of the Cascades, and that, prior to the sounding of the first bell, the Cascades had been running about 11 minutes full speed; that the bell to back was rung about one-half minute before the collision. Collett, who was the first assistant engineer on the Cascades at the time, and was at the engine, testifies that he heard fog signals by the Cascades for eight or ten minutes before the collision; that the Cascades was drifting for about a minute, not less than that, prior to his receiving the second bell for reversing the engine; that he responded by reversing the engine, and, when his wheel had made three or four revolutions back, the collision occurred. He relates also that the Cascades ran about ten minutes in the fog at full speed, and thinks she had slackened her speed about one-fourth when the signal to back was given. Capt. Barton, the pilot, is of the opinion that her speed was checked almost entirely. It is further shown by the testimony of Olney, the pilot on the Lurline, that both boats must have been almost at a standstill at the time of the collision; otherwise, he thinks the Lurline would have been broken entirely in two.

The question arises from this testimony, Which of these boats was in fault, the Cascades or the Lurline? It seems to be proven quite satisfactorily that the Lurline was pursuing a course upstream parallel with the Oregon shore, and from 200 to 250 feet distant therefrom. This is made apparent from the testimony of several witnesses who were on the Lurline, and were able to see the lights through the haze, though dimly, at the points Rainier, Blanchard's dock, and Smith's mill—Rainier being about a half mile farther down stream than Smith's mill. It is suggested that the Lurline was running in shore with the view of landing at Smith's dock, or perhaps had mistaken Smith's dock for Rainier, and hence was not pursuing a course upstream parallel with the shore. It was shown that the Lurline had some baggage on board, checked as freight, destined for Rainier, but that it was not the intention of putting the freight off at Rainier unless a call was received from shore requiring the boat to land to take on passengers, and, having received no such call, the boat did not approach nearer than about 200 feet to Rainier dock, and thence proceeded on her course. These facts show quite definitely that the Lurline was not heading inshore, but was on a course upstream, parallel with the shore.

There is little doubt that the Lurline was headed across the bow of the Cascades at the time of the collision. Having, therefore, fixed the definite course of the Lurline, it must be, without question, that the Cascades was herself proceeding almost squarely across stream. The pilot upon the Cascades attempted to account for being so near inshore by the statement that he was then upon his fog course, which carried him near shore. In this, however, he is in some contradiction, as he says that his course carried him within 600 or 800 feet of the shore; then that it would change; but undoubtedly he must have run in within 250 feet, because the collision took place at about that distance from shore. He affirms, furthermore, that he saw the light at Rainier, across his starboard bow, at the same time that he saw the red light of the Lurline, also across the starboard bow. Either he or one of the other witnesses on the Cascades states also that he saw the light at Smith's mill across the port bow of the Cascades about the same time. This would show quite definitely that the course of the Cascades was inshore, and that it must have, if its course had been pursued, come in contact with the shore before reaching Rainier at least. I conclude, therefore, that the course of the Lurline at the time of the accident was upstream, and parallel with the shore, and that the course of the Cascades was across the bow of the Lurline, and running inshore. This finding, however, does not solve the legal phase of the case.

The Lurline was running at full speed prior to the time that the colored lights were observed upon the Cascades, and this notwithstanding she had observed the masthead light previous thereto. The pilot seems to have been mistaken as to the distance and the course of this light, as he believed that it was some distance instream, and that it was passing safely as it related to his boat. But in this he was greatly mistaken, because the light was approaching him direct. On the other hand, the Cascades was running full speed ahead until a short time before the collision. When the red lights of the Lurline were discovered, she was then drifting—that is, her engine had been stopped— and she was spending the force or impetus previously attained. This had been her action from one to three or four minutes, so that her speed had been checked largely, perhaps to the extent of one-half, possibly more. When, however, the colored lights were discovered upon the Lurline, the Cascades reversed her engines and began to back, but was unable to check her speed wholly prior to the collision. There is no doubt from the testimony that the fog was quite dense, so much so that electric lights shone through it dimly at the distance of 300 or 400 feet. The condition was such that it required the sounding of the fog signals by each of the boats, and careful management in navigation. It is very evident that, if the rules of navigation had been observed by each of the boats relative to running in fog, there would have been no collision.

I am of the opinion that the Cascades was at fault in two particulars: First, she was entirely out of her course, as it has been shown by the testimony that the regular course of the passenger boats, running upstream, was near shore and parallel thereto, and for those passing down was further instream; second, she was running at full speed

for some time after hearing the fog signals from the Lurline, and was unable to check her speed entirely when the Lurline was sighted, before crossing her course, by reversing her engine and backing.

On the other hand, I find that the Lurline was at fault for running at full speed, although upon her course, while in a fog such as existed at that time—especially as she had heard the fog signals from the Cascades, and had even observed her masthead light. The pilot was mistaken as to the course the Cascades was pursuing judging from her light, and this, no doubt, led him to believe that he could pass in safety while under full head; but he should not have taken the chances—he should have observed the rules of navigation by putting his boat under such control that he could stop her upon observing the approaching boat. The Columbia river in the vicinity of the place where the collision occurred must be held to be a narrow channel, which is subject to the regulation of article 25 of the Inland Navigation Rules (Act Cong. June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), requiring steam vessels, when safe and practicable, to keep to the side of the fairway which lies on the starboard side. United States v. Port of Portland (D. C.) 161 Fed. 193. This rule, read in connection with article 16 of the same act (30 Stat. 99 [U. S. Comp. St. 1901, p. 2880]), covers the legal inquiry involved by the facts in this case. The article is as follows:

"Art. 16. Every vessel shall, in a fog, mist, falling snow or heavy rain storms, go at a moderate speed, having careful regard to the existing circumstances and conditions. A steam vessel, hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

What is a moderate rate of speed is aptly stated by Judge Lowell, in The Cambridge, Fed. Cas. No. 2,334. He says:

"It is impossible for the courts to overlook a plain breach of the written law, upon any consideration of hardship in its application. It is useless to cite the many cases which show what is a moderate rate of speed for a steamer in a fog. No general rule has ever been attempted to be laid down but this: That the speed should be such as will enable the steamer to avoid the other vessel after she shall be able to make her out. This test may seem a little too much like deciding each case by the event, and holding any speed too great where there has been a collision; but it has been adopted by high authority, both here and in England."

And in a later case, to wit, The Eleanora, Fed. Cas. No. 4,335, Mr. Chief Justice Waite, acting as Circuit Justice, has this to say upon the subject:

"I have had no difficulty in reaching the conclusion that both vessels are responsible for this collision. A simple slackening of speed by a steamer in a fog is not always enough. She must run at a moderate speed (Rev. St. § 4233, rule 21 [U. S. Comp. St. 1901, p. 2898]), and is never justified in coming in collision with another vessel, if it be possible to avoid it (Sup. Ins. rule 4). This implies such a speed only as is consistent with the utmost caution. Having complete control of herself, and being capable of so much damage if a collision does take place, the law has imposed on her the obligation of so directing her own movements, in the midst of the uncertainties of a fog at sea, as to be at all times under easy command. If she fails in this she must suffer

the consequences. Her rate of speed must be graduated according to the circumstances. The more dense the fog the greater the necessity for moderation. The object is to keep her, if possible, under such control that she can be stopped after another vessel, with which she is in danger of collision, may be seen, or otherwise discovered. She has the right to assume that other vessels will perform their duties and act accordingly, but she has no right to disregard any obligation placed on herself."

So Mr. Justice Brown has said, in the case of The Umbria, 166 U. S. 404, 417, 17 Sup. Ct. 610, 615 (41 L. Ed. 1053):

"The general consensus of opinion in this country is to the effect that a steamer is bound to use only such precautions as will enable her to stop in time to avoid a collision, after the approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law. In a dense fog this might require both vessels to come to a standstill, until the course of each was definitely ascertained. In a lighter fog it might authorize them to keep their engines in sufficient motion to preserve their steerageway."

And at page 420 of 166 U. S., page 617 of 17 Sup. Ct. (41 L. Ed. 1053), he continues:

"The propriety of certain maneuvers cannot be determined by the chance that the two vessels may, or may not, reach the point of intersection at the same time, but by the question whether their speed can be stopped before their arrival at the point where their courses intersect. If two steamers are approaching each other in a fog, manifestly their maneuvers must be determined, not by the chance of their meeting at a point where their courses intersect, but upon the theory that their courses shall not actually intersect—in other words, that both shall stop before the point of intersection is reached; and if one of them is running at such a speed that no maneuver on the part of the other can prevent that one from passing the point of intersection, the latter only is responsible."

In the case cited the Umbria was running at full speed at the time of the collision, and in a fog. The Iberia, upon the other hand, was proceeding at a lower rate of speed, and, as she was passing the course of the Umbria, was run into by the latter steamer and sunk. The facts there are not greatly different from the facts in this case. The analogy, at least, is manifest. As has been previously remarked, the Cascades was out of her course, and running directly across the regular course of the steamers going upstream. The density of the fog may be measured by the fact that the colored lights could not be seen more than 300 or 400 feet distant, so that it required more than usual caution on the part of the Cascades, especially in crossing the regular course of steamboats. This was especially a fault as she was not keeping to the side of the river required by boats in passing. It is clear that each of the boats heard the fog whistles of the other. As the Lurline saw the masthead light of the Cascades, the Cascades should also have seen the masthead light of the Lurline; but it seems that she did not. However, she saw the light on the shore past the light of the Lurline, and, at the time of the accident, was running directly inshore, and her speed should then have been so modified as that, on discovering the proximity of the Lurline, she could have stopped before crossing the Lurline's path. But these faults do not excuse the fault of the Lurline in running at full speed under the condition of the atmosphere at the time, and locality.

I assess the damages sustained by the steamer Lurline as follows:

| | |
|---|---:|
| Expense incurred in raising steamer | $1,430 88 |
| Damage to cargo aboard steamer | 1,524 05 |
| Expense incurred on account of repairs | 2,764 51 |
| Expense incurred in replacing equipment and furnishings of steamer | 715 02 |
| Freight charges uncollected and not collectible on account of damage | 25 05 |
| Demurrage from November 22, 1906, to January 11, 1907, 49 days @ $60 per day | 2,940 00 |
| Making a total of | $9,399 51 |

From this should be deducted two items. one for amount received on account of sales of damaged goods......... $163 20
And the other for a refund from the O. R. & N. Company for cash fares paid...... 3 00

166 20

Which leaves a balance of.............. $9,233 31

I assess the damages sustained by the Cascades as follows:

| | |
|---|---:|
| For repairs | $ 89 00 |
| For demurrage, 5 days @ $60 per day | 300 00 |
| | $389 00 |

Adding these two sums, $9,622.31, and dividing by 2, $4,811.15, gives the amount which the libelant is entitled to recover from the respondent, and a decree will be entered accordingly.